Egan Jr., J.
Appeal from a judgment of the Supreme Court (Coccoma, J.), rendered January 12, 2011 in Schenectady County, upon a verdict convicting defendant of the crimes of murder in the first degree, murder in the second degree, attempted robbery in the first degree (three counts), attempted robbery in the second degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, reckless endangerment in the first degree and tampering with physical evidence.
During the early morning hours of September 1, 2008, defendant and his cohorts—Tyrell Durham and David Dickerson—met up with Jennifer Derenzo Williams (hereinafter Derenzo) and her then boyfriend, Christopher Williams, at a Hess gas station in the City of Schenectady, Schenectady County. Defendant was driving a blue Lexus that he had borrowed from a friend, and Derenzo was driving a rented Toyota Camry. The group, at least some of whom already had been drinking beer and/or smoking marihuana, purchased additional beer and decided to continue partying at the home of Travis Cellini, where they remained until approximately 4:30 a.m. After departing Cellini’s home, the group—consisting of Derenzo and Williams in the Camry and defendant, Dickerson and Durham in the Lexus—unsuccessfully attempted to purchase marihuana from a local “weed spot.” The group continued to drive around Schenectady County and, at some point, defendant struck a curb with the Lexus and apparently damaged one of the wheels. Defendant then parked *1273 the vehicle in the lot of a local hotel, and the group set out again in Derenzo’s Camry. When Williams expressed interest in finding another weed spot, defendant directed him to 933 Albany Street in Schenectady—a location from which he previously had purchased marihuana.
Upon arriving at that address, defendant entered an apartment and made his purchase from Tristan Phillips. Defendant, however, was dissatisfied with the quality of his purchase and thereafter devised a plan to rob the weed spot in order to obtain money to fix the damaged Lexus. At defendant’s request, Williams retrieved a 9 millimeter handgun that he had stashed at a friend’s house earlier that evening, and the group then drove back to 933 Albany Street.[1] Once there, Derenzo parked a few houses away in order to avoid detection, and defendant, Williams, Durham and Dickerson exited the Camry and entered the weed spot.
Defendant knocked on the door of the apartment, told Phillips why he was there, explained that he had been in an accident and asked Phillips to let him inside so that he could wash his hands. Williams, Dickerson and Durham waited—apparently out of sight—in the hallway. Defendant told Phillips that he was waiting for his “homeboy” to bring him money for the purchase and lingered in the apartment—waiting for Williams to rush in as planned. When Williams failed to materialize, defendant told Phillips that he had changed his mind and started to leave. At this point, Ulysses Canty—the alleged proprietor of the weed spot—became suspicious, pushed defendant from the apartment and closed the door behind him.[2] According to Williams and Durham, defendant then grabbed the gun from Williams and fired multiple shots at the closed door. Canty, who was braced against the inside of the door, was struck and fatally wounded. Defendant, Williams, Durham and Dickerson then fled the scene in Derenzo’s Camry, which she crashed into a telephone pole shortly thereafter.
Defendant subsequently was arrested in connection with unrelated drug sales made to a confidential informant (see People v Johnson, 91 AD3d 1194 [2012], lv denied 18 NY3d 995 [2012]) and, in September 2009, was indicted and charged with various crimes stemming from the shooting at the weed spot. Following a 14-day jury trial, defendant was convicted of the crimes of *1274 murder in the first degree, murder in the second degree, attempted robbery in the first degree (three counts), attempted robbery in the second degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, reckless endangerment in the first degree and tampering with physical evidence and thereafter was sentenced to an aggregate prison term of 28V2 years to life. This appeal ensued.
We affirm. Defendant initially challenges certain of Supreme Court’s pretrial rulings, including the court’s decision to permit the People to introduce evidence regarding defendant’s drug-trade activity and rumored affiliation with the Bloods gang. “Generally speaking, evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions—motive, intent, absence of mistake, common plan or scheme and identity—or where such proof is inextricably interwoven with the charged crimes, provide[s] necessary background or complete[s] a witness’s narrative” (People v Burnell, 89 AD3d 1118, 1120 [2011], lv denied 18 NY3d 922 [2012] [internal quotation marks and citations omitted]). Here, defendant’s drug-related activities and purported gang membership provided necessary background information, explained how Derenzo, Williams, Durham, Phillips and defendant knew one another (as well as why defendant’s acquaintances went along with his plan to rob the weed spot) and, viewed in the context of the activities that occurred prior to the shooting, established both defendant’s awareness of the weed spot and a motive for the shooting; thus, such “evidence was highly probative of several relevant and material issues at trial and genuinely interwoven with the facts surrounding the shooting” (People v Williams, 28 AD3d 1005, 1008 [2006], lv denied 7 NY3d 819 [2006]; see People v Jackson, 100 AD3d 1258, 1261 [2012]; People v Burnell, 89 AD3d at 1120-1121; People v Lee, 80 AD3d 877, 880 [2011], lv denied 16 NY3d 833 [2011]). We also are persuaded that Supreme Court, which revisited this issue frequently throughout the trial, properly balanced the probative value of such evidence against its prejudicial effect and gave appropriate limiting instructions (see People v Lee, 80 AD3d at 880). Under these circumstances, we discern no error in the admission of the proffered evidence.
We do, however, find that portions of defendant’s November 24, 2008 video-recorded interview—conducted by a member of the Schenectady Police Department—should have been suppressed based upon defendant’s clear invocation of his right to *1275 remain silent.[3] The case law makes clear that “[a] defendant’s invocation of the right to remain silent must be scrupulously honored” (People v Logan, 19 AD3d 939, 941 [2005], lv denied 5 NY3d 830 [2005] [internal quotation marks and citations omitted]; see Miranda v Arizona, 384 US 436, 479 [1966]; People v Caruso, 34 AD3d 860, 862 [2006], lv denied 8 NY3d 879 [2007]) once the right is asserted in an “unequivocal and unqualified” fashion (People v Horton, 46 AD3d 1225, 1226 [2007], lv denied 10 NY3d 766 [2008]). Whether a defendant’s request in this regard is “unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request[,] including the defendant’s demeanor, manner of expression and the particular words found to have been used by the defendant” (People v Zacher, 97 AD3d 1101, 1101 [2012], lv denied 20 NY3d 1015 [2013] [internal quotation marks and citation omitted]).
Here, defendant was interviewed for approximately 30 minutes on November 24, 2008 by a detective with the Schenectady Police Department. After advising defendant of his Miranda rights, the detective began questioning defendant regarding his association with Derenzo and Williams, as well as his activities on the morning of the shooting. Less than 18 minutes into the interview, however, defendant stated that he did not wish to answer any more questions; in response, the detective indicated that he nonetheless wished to ask additional questions of defendant and thereafter proceeded to do so. This pattern—as summarized below—would repeat itself over the course of the next 13 minutes or so until defendant uttered the word “lawyer” and the questioning finally ceased.[4]

“7:53:15 a.m.

“Defendant: I don’t wanna do no more questions, man. I wanna see what I’m about to be locked up for.
*1276 “Detective: Well, I think you are going to be locked up for sales, sales of drugs.
“Defendant: Alright.
“Detective: Alright?
“Defendant: Alright.
“Detective: OK, but I still wanna continue to ask you some questions . . .
“Defendant: Hold on, hold on, hold on, enough. I don’t want to finish answering the questions. I don’t wanna be rude or disrespectful neither sir.
“Detective: I haven’t been rude or disrespectful to you.
“Defendant: I know, I know it. And I don’t, I don’t wanna like, seem like I’m being rude or disrespectful like I just said for all of the questioning just because . . .
“Detective: Alright, let’s go back to uh . . .
“Defendant: I really don’t wanna answer.
“Detective: Let’s do the yes or no thing, yes or no.
“Defendant: Alright.” . . .

“8:02:16 a.m.

“Defendant: I don’t want any more questions.”

“8:05:25 a.m.

“Defendant: Like I’m, I’m done with the questioning like, not to be rude . . .
“Detective: Well, you’re not being rude. You’re doing pretty good. I’m not done with the questioning yet.
“Defendant: I don’t—all right [sic], fine, I ain’t got no more answers.” . . .

“8:05:57 a.m.

“Defendant: Listen, listen. Hear me? Say right to me, said like I read my rights. Like I don’t got a lawyer present . . . That’s what I’m trying to tell you, so . . .
“Detective: What are you trying to tell me?
“Defendant: I don’t want to talk no more . . .
“Detective: Okay, that’s fine.
“Defendant: . . . like I want to go over to the jail.
“Detective: All right [sic].
“Defendant: Lock up, get my phone call, please.”
As the foregoing summary makes clear, defendant repeatedly invoked his right to remain silent at numerous points throughout the interview (compare People v Horton, 46 AD3d at 1226; People v Caruso, 34 AD3d at 862-863; People v Logan, 19 AD3d *1277 at 941) and, at all times prior to the actual termination thereof, the detective in question repeatedly ignored defendant’s assertion of his constitutional right. The recorded interview and accompanying summary leave no doubt as to what transpired, and the detective in question acknowledged at the underlying Huntley hearing—and at the earlier Huntley hearing conducted on the unrelated drug charges—that he continued to question defendant despite the fact that defendant more than once indicated that he did not wish to answer any more questions.[5] Accordingly, Supreme Court erred in failing to suppress those statements made by defendant after the point in time that he first unequivocally stated that he no longer wished to answer any further questions (see People v Rodriguez, 77 AD3d 975, 975-976 [2010], lv denied 16 NY3d 836 [2011]). However, for the reasons that follow, we deem the admission of the redacted interview[6] into evidence to be harmless error and, therefore, reversal of defendant’s conviction is not required. We reach a similar conclusion regarding defendant’s related claim—namely, that Supreme Court further erred in failing to redact from defendant’s recorded statement his various invocations of his right to remain silent.
Where, as here, the asserted error is of a constitutional dimension, the error may be deemed harmless only if “there is no reasonable possibility that the error might have contributed to defendant’s conviction and that it was thus harmless beyond a reasonable doubt” (People v Crimmins, 36 NY2d 230, 237 [1975]; see People v Best, 19 NY3d 739, 744 [2012]; People v Westervelt, 47 AD3d 969, 973 [2008], lv denied 10 NY3d 818 [2008]). In our view, the testimony of, among others, Derenzo, Williams, Durham and Phillips, together with the independent fingerprint and DNA evidence,[7] constitute overwhelming evidence of defendant’s guilt. We therefore conclude that there is *1278 no reasonable possibility that the statements made by defendant after he first invoked his right to remain silent, which did not include any admission of guilt, contributed to his conviction (see People v Cobb, 97 AD3d 1166, 1167-1168 [2012], lv denied 19 NY3d 1101 [2012]; People v Rodriguez, 77 AD3d at 976; People v Chambers, 18 AD3d 571, 572 [2005], lv denied 5 NY3d 786 [2005]; People v Nunez, 9 AD3d 471, 472 [2004], lv denied 4 NY3d 766 [2005]).[8]
Finally, we reject defendant’s assertion that his conviction with respect to the charge of murder in the first degree is not supported by legally sufficient evidence[9] and, further, is against the weight of the evidence. Insofar as is relevant here, “[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person” while in the course of committing or attempting to commit a robbery or in the immediate flight therefrom (Penal Law § 125.27 [1] [a] [vii]). Defendant specifically takes issue with the intent element of this crime, arguing that while the evidence may support a finding that he acted with depraved indifference, it fell short of establishing that he intended to kill Canty. We disagree.
Defendant’s intent may be inferred from both his actions and the surrounding circumstances (see People v Rogers, 94 AD3d 1246, 1250 [2012], lv denied 19 NY3d 977 [2012]; People v Ford, 90 AD3d 1299,1300 [2011], lv denied 18 NY3d 994 [2012]; People v Molina, 79 AD3d 1371, 1376 [2010], lv denied 16 NY3d 861 [2011]). Here, Derenzo, Williams and Durham testified that defendant—agitated, nervous and dissatisfied with his prior purchase of marihuana from Phillips—decided to rob the weed spot in order to obtain money to pay for repairs to the damaged Lexus. When the robbery failed to progress as planned and defendant was abruptly pushed out of the apartment, Williams and Durham testified, defendant grabbed the gun from Williams and attempted to either prevent the apartment door from fully closing or force his way back inside. At this point, defendant fired five shots at the door; four of the projectiles struck and penetrated the door—at varying heights, locations and angles of trajectory—and one of the projectiles penetrated the surrounding frame. According to Durham, one of these shots *1279 was fired at “close range”—an observation corroborated by the subsequent crime scene investigation—and Phillips testified that Canty, who had just pushed defendant out of the apartment and “closed the door real fast,” was bracing himself against the door at the time the shooting began. As the shots rang out, Canty started to run for cover, whereupon he exclaimed, “I’m hit. I’m hit. Oh, man” and collapsed. Although there was other evidence in the record that could have supported a finding that the shooting was not intentional,[10] we are satisfied—based upon our review of the record as a whole—that there is ample evidence to support defendant’s conviction of intentional murder. As the verdict is supported by legally sufficient evidence and is not against the weight of the evidence, it will not be disturbed. Defendant’s remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.
Peters, PJ., Rose and Stein, JJ., concur. Ordered that the judgment is affirmed.

. Derenzo later would describe defendant’s mood during this time as agitated. Durham would offer similar testimony, stating that defendant was nervous and in need of money to pay for the repairs to the Lexus.

. Canty apparently was not present when defendant made his original purchase earlier that morning.

. We reject the People’s assertion that defendant’s challenge in this regard is barred by the doctrine of collateral estoppel. Although the doctrine applies in both the civil and criminal realms (see People v Aguilera, 82 NY2d 23, 29 [1993]; People v Williams, 93 AD3d 1212, 1212 [2012], lv denied 19 NY3d 978 [2012]), it “is not as liberally applied in criminal prosecutions as in civil actions” (People v Acevedo, 69 NY2d 478, 485 [1987]). Based upon our review of the record, we are not persuaded that, among other things, defendant had a full and fair opportunity to litigate this issue in the context of his earlier prosecution on the unrelated drug charges.

. To the extent that any discrepancies exist with respect to the length of the interview and/or the time that various questions were asked and answered, we have adopted the time-stamp references depicted on the actual video. Similarly, to the degree that there may be minor discrepancies between the recorded interview and the typed summary thereof, we have deferred to defendant’s recorded statements.

. The People provided this Court with the transcript of the prior Huntley hearing, wherein the detective conceded that, at some point prior to the actual conclusion of the interview, defendant indeed indicated that he did not want the detective “to ask him anymore [sic] questions,” to which the detective replied, “[B]ut I told him I still had some more questions to ask him. And we did continue with the interview.” When asked why he continued to question defendant after defendant indicated that “he no longer wanted to talk,” the detective again stated, “Because there was [sic] more questions I wanted to ask him.”

. The copy of the DVD entered into evidence and submitted to the jury depicts the interview concluding at approximately 8:05:52 a.m. on the morning in question, i.e., before defendant made any mention of an attorney.

. Although such evidence does not place defendant at the scene of the crime, it does corroborate other details provided by Derenzo, Williams and Cellini.

. To the extent that defendant takes issue with the credibility of certain of the People’s witnesses, we need note only that any prior criminal histories and/or leniency agreements made with the People in exchange for such testimony were fully explored at trial.

. Defendant preserved this issue for our review by making specific motions in this regard at the close of the People’s case and again at the close of all proof.

. An inmate at the local jail testified that he overheard defendant discussing the shooting and, according to defendant, he just went to the weed spot to “do some thief work” and “it . . . wasn’t supposed to happen that way.”