THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL T. VICIOSO, Appellant. [983 NYS2d 691]—

Stein, J. Appeal from a judgment of the County Court of Chemung County (Hayden, J.), rendered July 6, 2012, upon a verdict convicting defendant of the crime of robbery in the second degree.

On January 18, 2012, defendant, at the behest of Charles Barnes, called a taxicab company and requested to be picked up at an address located in the City of Elmira, Chemung County. Shortly after the cab arrived at that address—which was a vacant building—defendant approached the vehicle and began to open the passenger-side door. At the same time, Barnes, who was wearing a hockey mask and a black hooded sweatshirt, pointed what appeared to be a firearm at the cab driver (hereinafter the victim) and demanded his money. The victim turned over approximately $80 to Barnes, who later gave $20 to defendant. After receiving information regarding the robbery, the City of Elmira Police Department SWAT team executed a search warrant at defendant's apartment and found a hockey mask and a BB gun. Defendant was thereafter charged by indictment with one count of robbery in the second degree under a theory of accomplice liability. Following a jury trial, defendant was convicted as charged and was thereafter sentenced to 3½ years in prison, followed by five years of postrelease supervision, and was ordered to pay restitution.[1] Defendant now appeals, challenging the legal sufficiency of the evidence adduced at trial.

---

1. Barnes pleaded guilty to attempted robbery in the second degree.

We affirm. As relevant here, "[a] person is guilty of robbery in the second degree when he [or she] forcibly steals property and . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he [or she] or another participant in the crime . . . [d]isplays what appears to be" a firearm (Penal Law § 160.10 [2] [b]). A defendant can be found guilty of robbery in the second degree under a theory of accomplice liability when such defendant, with the intent to forcibly steal property, "solicits, requests, commands, importunes, or intentionally aids [another] person to engage in . . . conduct" which constitutes that offense (Penal Law § 20.00; *accord People v Bush*, 75 AD3d 917, 918 [2010], *lv denied* 15 NY3d 919 [2010]). Further, to the extent that defendant asserts that he was not aware that Barnes would use a firearm in the course of the robbery, we note that "strict liability for an aggravating circumstance attaches to an accomplice, regardless of [his or her] degree of intent, knowledge or conduct with respect to the aggravating circumstance" (*People v Gage*, 259 AD2d 837, 839 [1999], *lv denied* 93 NY2d 924 [1999], *lv denied upon reconsideration* 92 NY3d 970 [1999]; *see People v Shuler*, 100 AD3d 1041, 1043 [2012], *lv denied* 20 NY3d 988 [2012]).

We are unpersuaded by defendant's argument that the evidence was insufficient to establish the element of intent necessary for accomplice liability. Defendant's intent to forcibly steal money from the victim can readily "be inferred from [his] conduct and from the surrounding circumstances" (*People v Bush*, 75 AD3d at 918; *see People v Johnson*, 106 AD3d 1272, 1278 [2013], *lv denied* 21 NY3d 1043 [2013]; *People v Ford*, 90 AD3d 1299, 1300 [2011], *lv denied* 18 NY3d 994 [2012]). According to witnesses who were present at defendant's apartment on the day of the robbery—and as conceded by defendant himself—defendant and Barnes engaged in a conversation about robbing a cab driver shortly before the robbery. Not long thereafter, witnesses saw defendant and Barnes leave the apartment and then return approximately 20-30 minutes later. Upon their return, they were heard to say that "they did something" and that they had hidden a gun in the back window of the apartment.

The victim testified that he was dispatched by his employer to an address, which turned out to be a vacant building. When he arrived at that location, he saw defendant approach the passenger-side door and begin to open it. At the same time, another individual wearing a mask and hoodie opened the driver-side door, pointed what appeared to be a gun at him, demanded his money, and told defendant to walk away from the cab if he

did not "want to get shot too," at which point defendant took off running. A subsequent search of defendant's apartment by the police yielded a mask and a BB gun, which were discovered on a window ledge in the basement. The victim identified the seized mask and firearm as those from the robbery.[2]

The manager of the taxicab company that employed the victim testified that defendant called the day after the robbery, identified himself by name and reported that he was the individual who had called for the cab that had been robbed the previous night. Although defendant stated that the robber had been wearing a mask, he never indicated that he knew the robber's identity. Defendant then called the police department, spoke to an investigator and stated that he was the individual in the cab that had been robbed. The following day, defendant went to the police department, where he gave a written statement—which was admitted into evidence at trial—in which he claimed that he called the cab because he was walking home and his ankle started hurting and that, when he approached the cab, a person with a hoodie and face mask opened the driver-side door, pointed a gun at the driver's face and threatened to shoot defendant if he did not leave.

After the search of defendant's apartment and the seizure of the mask and gun, defendant was arrested and brought to the police station, where he was advised of his *Miranda* rights. He then gave a second statement to police—which was also reduced to writing and received in evidence at trial—in which he admitted that he had not been truthful in his previous statement. Defendant confessed that, prior to the robbery, he and Barnes were in defendant's apartment and discussed robbing a cab. He observed Barnes with a black mask and gun that "looked like a police gun." Defendant also stated that, as they were leaving the apartment, he saw Barnes tuck the gun into the waistband of his pants and put the mask in his hoodie. Barnes told him to call a cab to an abandoned building, where defendant waited for the cab to arrive and Barnes left. According to defendant's statement, he knew at that time that Barnes was going to commit the robbery, but hoped that Barnes would change his mind. Defendant also told police that, after he and Barnes had returned to defendant's apartment, Barnes gave him some of the money that Barnes had taken from the victim.

---

2. A witness, who is an acquaintance of Barnes, testified that, on the day before the robbery, he and Barnes returned to the witness's home after shooting the witness's BB gun in the woods, and that he hid the gun in his mother's room. After the robbery, the witness discovered that the gun was missing and, at trial, he identified the firearm that was used during the robbery as his BB gun.

The foregoing evidence, when viewed in the light most favorable to the People, establishes a valid line of reasoning and permissible inferences from which a rational juror could have found beyond a reasonable doubt that defendant intended to forcibly steal money from the victim when he intentionally aided Barnes in his plan to rob the victim by calling a cab to a vacant building while Barnes used what appeared to be a firearm to force the victim to hand over money (see People v Reed, 22 NY3d 530, 534-535 [2014]; People v Bush, 75 AD3d at 919; see also People v Bleakley, 69 NY2d 490, 495 [1987]). Accordingly, the evidence was legally sufficient to establish that defendant acted with the state of mind required for the commission of the crime of robbery in the second degree as an accomplice. We have examined defendant's remaining contentions and find them to be lacking in merit.

Lahtinen, J.P., Garry and Rose, JJ., concur. Ordered that the judgment is affirmed.