(May 8, 2014)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL L. MALAK, Appellant. [984 NYS2d 666]—

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Egan Jr., J. Appeal from a judgment of the County Court of Ulster County (Czajka, J.), rendered November 19, 2010, upon a verdict convicting defendant of the crime of murder in the second degree.

On March 25, 1996, defendant, Alexander Barsky and Joseph Martin—each then 15 years old—were classmates attending the same school in Ulster County. According to Barsky, Martin had stolen money and marihuana from him during the six months prior to this date, prompting Barsky and defendant to formulate a plan to lure Martin to a cabin in the woods in order to attack him. The cabin, which was located approximately 100 yards from defendant's residence, had been built by defendant, Barsky and others—using stockade fencing, sheet metal, metal pipes and a blue tarp—approximately one year earlier and served as a "ramshackle," "local neighborhood hangout." The stated plan was for defendant, Barsky and Martin to meet at the intersection of Schwabie Turnpike and Samsonville Road in the Town of Rochester, Ulster County and then follow two trails through the woods to the cabin, where the three would drink beer, smoke marihuana and watch for a comet that was scheduled to appear in the night sky. According to Barsky, he only intended to hurt Martin.

In furtherance of this plan, Barsky later would relate, he and defendant met up with then 18-year-old Christopher Brown on the afternoon of March 25, 1996, and Brown assisted them in procuring two 12-packs of beer and a quantity of marihuana. Later that evening, defendant, Barsky and Martin participated in a three-way phone call—overheard by Martin's brother—wherein the three arranged to meet "for an evening of beer, marihuana and watching the comet." At some point after 10:00 p.m., Martin climbed out of his bedroom window to meet defendant and Barsky. After the three converged at the designated intersection, they followed the trails through the woods to the cabin—arriving there at approximately 11:00 p.m.

Upon arriving at the cabin, the three began to drink the beer and smoke the marihuana that had been purchased through

Brown earlier that afternoon. According to Barsky, as Martin knelt down to block the wind so that he could light up a marihuana pipe, defendant, who was standing behind and to the right of Martin, swung a steel pipe—measuring approximately two feet in length—"[w]ith great force" at the back of Martin's head, causing Martin to fall to the ground. As Martin lay on the ground face up, defendant struck Martin—"[w]ith strong force"—on the side of his head before handing the pipe to Barsky. Barsky delivered two blows to Martin's legs before handing the pipe back to defendant, who then struck Martin "approximately two more times" on his upper body.

Following the attack, defendant and Barsky placed Martin in a wheelbarrow and moved him 50 to 100 yards away from the cabin. Defendant then informed Barsky that "he would take care of the rest." At this point, defendant and Barsky walked to a quarry near defendant's house, consumed additional beer and discussed what to do next. Shortly thereafter, the two parted company—having agreed that, "if anybody asks, to say that [Martin] . . . never showed up that night." According to Barsky, defendant warned him "to keep [his] mouth shut or [he would be] next."

Defendant and Barsky initially stuck with their story and, within days of Martin's disappearance, each gave written statements to law enforcement officials admitting that they had plans to meet Martin on the night in question, but contending that Martin never arrived and disavowing any knowledge of his whereabouts. Although subsequent searches of the area surrounding Martin's residence, the intersection of Schwabie Turnpike and Samsonville Road and the quarry failed to disclose any trace of Martin,[1] Barsky returned to the cabin several months later and located Martin's remains underneath an overhanging rock—located approximately 50 to 100 feet away from the point where Martin was last seen. As he peered into the crevice created by the overhanging rock, Barsky observed what he described as a blanket partially covering Martin's remains, which, according to Barsky, consisted solely of bones. Barsky, who by then was living in New York City, returned to the scene again in "the winter of 2002" and "cleared away what remains [he] could find"—placing the bones he collected in black plastic bags that he disposed of upon his return home. In September 2002, Barsky spoke with defendant, who suggested that Barsky "go back to the site and find everything and remove . . . the

---

1. In their respective written statements, both defendant and Barsky identified the quarry—not the cabin in the woods—as their destination that evening.

remains," in response to which Barsky said, "Just don't worry about it."[2]

Martin's fate remained a mystery until May 2008, when State Police again questioned Barsky regarding the events of March 1996. Barsky initially repeated "the same [story] that [he] had told State Police investigators in 1996"; upon further questioning, however, Barsky admitted what had transpired and thereafter led investigators to the cabin in the woods and the burial site. A subsequent search of the rock crevice revealed a bedding comforter—rolled up like a "cigar"—containing a tooth fragment, and a further search of the area uncovered "[n]umerous bone fragments."[3]

Defendant thereafter was indicted and charged with one count of murder in the second degree. Following a jury trial, at which Barsky, a forensic mitochondrial DNA examiner and a forensic anthropologist—among others—appeared and testified, defendant was convicted as charged and was sentenced to a prison term of 15 years to life, to be served consecutively to the sentence that defendant then was serving. Defendant now appeals, primarily contending that his conviction is against the weight of the evidence because there is insufficient evidence to corroborate Barsky's testimony implicating him in the attack.

Pursuant to CPL 60.22 (1), "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense." The corroborative evidence required by the statute, however, "need not . . . establish each element of the [charged] offense or even an element of the offense" (*People v Forbes*, 111 AD3d 1154, 1157 [2013] [internal quotation marks and citations omitted]), nor must such evidence independently "prove that [defendant] committed" the crime in question (*People v Reome*, 15 NY3d 188, 192 [2010] [internal quotation marks and citation omitted]; *see People v Pagan*, 87 AD3d 1181, 1182 [2011], *lv denied* 18 NY3d 885 [2012]). Rather, "[i]t is enough if [the corroborative evidence] tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth" (*People v Reome*, 15 NY3d at 192 [internal quotation marks and citations omitted]; *accord*

---

**2.** Although it is unclear what Barsky meant by "winter of 2002," it appears that he collected and disposed of Martin's remains prior to his September 2002 conversation with defendant.

**3.** In August 2008, Barsky waived indictment and pleaded guilty to a superior court information charging him with manslaughter in the first degree and thereafter was sentenced to 3⅓ to 10 years in prison.

*People v Forbes,* 111 AD3d at 1157; *see People v Pagan,* 87 AD3d at 1182). Notably, "even [s]eemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration" (*People v Caban,* 5 NY3d 143, 155 [2005] [internal quotation marks and citation omitted]; *accord People v Berry,* 78 AD3d 1226, 1227 [2010], *lv denied* 16 NY3d 828 [2011]).

Upon our review of the record, we find ample evidence to corroborate Barsky's accomplice testimony. Brown confirmed that he helped procure beer and marihuana for Barsky and defendant on the afternoon of March 25, 1996 and thereafter assisted defendant in transporting the beer to the cabin in the woods. Brown further testified that although defendant invited him to meet up with Barsky and Martin at the cabin later that evening, defendant never called Brown—as promised—to advise of the meeting time and, when Brown spoke with defendant at school the next day, defendant indicated that Martin "never showed up" to watch the comet. Additionally, as noted previously, Martin's brother testified that he overhead the three-way conversation between defendant, Barsky and Martin, wherein the three arranged to meet "for an evening of beer, marihuana and watching the comet." Indeed, defendant's own written statement—provided to the State Police five days after Martin's fatal encounter with defendant and received into evidence at trial—confirmed that he, Barsky and Martin planned to meet at the intersection of Schwabie Turnpike and Samsonville Road between 10:45 p.m. and 11:00 p.m. on the evening in question "to hang out and watch the comet and drink some beer," but that Martin "never showed up there."

In addition to the foregoing, various witnesses testified as to the location, appearance and characteristics of both the cabin in the woods and the burial site—testimony that was entirely consistent with the details provided by Barsky. As noted previously, a search of what Barsky described as the burial site revealed, among other things, a comforter, a portion of a tooth and numerous bone fragments—all of which thereafter underwent forensic analysis. Although no biological material apparently was found on the comforter, a forensic examiner from the Minnesota Bureau of Criminal Apprehension Forensic Science Laboratory testified that she extracted mitochondrial DNA[4] from a the tooth fragment recovered from the burial site, which she then

4. As the forensic examiner explained, each cell in the human body contains two forms of DNA—nuclear DNA and mitochondrial DNA. Nuclear DNA is inherited from both parents and is unique to a particular individual. Mitochondrial DNA, on the other hand, is inherited only from one's mother

compared to the mitochondrial DNA extracted from a buccal swab provided by Martin's mother. A comparison of those two profiles revealed that "the mitochondrial DNA profile obtained from the . . . tooth . . . and the mitochondrial DNA profile obtained from the known sample [provided by Martin's mother] were the same." According to the examiner, one would expect to see this particular DNA profile—outside of the Martin family's maternal line—in only .44% of the Caucasian population. Finally, the forensic anthropologist who examined the bone fragments recovered from the burial site—consisting of five hand bones, one foot bone, one mandible (lower jaw) fragment and the tooth fragment—opined that all of the remains were human and, based upon the fusion (or lack thereof) in the relevant growth plates, belonged to an individual who was approximately 14 to 16 years old at the time of death. Significantly, the forensic anthropologist noted a fracture to the left side of the mandible and opined that "the most likely mechanism for that fracture" would be a lateral blow.

The foregoing evidence, in our view, is more than sufficient to provide the "slim corroborative linkage" (*People v Breland*, 83 NY2d 286, 294 [1994]) required by CPL 60.22 (1). To the extent that defendant points out that it was Barsky who had a "beef" with Martin and, further, argues that Barsky's prior criminal history—together with the "sweetheart" plea deal he received in exchange for his testimony—renders such testimony "highly suspect," all of these issues were fully explored during cross-examination and, in the final analysis, posed credibility questions for the jury to resolve (*see People v Forbes*, 111 AD3d at 1157-1158). Accordingly, we do not find the jury's verdict to be against the weight of the evidence.

The remaining arguments raised by defendant do not warrant extended discussion. To the extent that defendant contends that County Court abused its discretion in fashioning a *Sandoval* compromise with respect to his 1998 conviction of murder in the second degree, whereby the People would be permitted to elicit from defendant—if he testified—that he was convicted of an unspecified felony but barred from exploring the nature thereof, we disagree. Such conviction was not, in our view, too remote in time to be considered pertinent and, as County Court properly noted, the conviction was indicative of defendant's

---

and, hence, is not unique to a particular individual. Where, however, there is "maternal linkage" between family members, such as between a mother and her child, those family members would have "the same mitochondrial DNA profile." Mitochondrial DNA testing was employed here because certain types of samples, including teeth, typically are not amenable to nuclear DNA testing.

willingness to place "his interests beyond those of society." In light of the appropriate limitations placed upon the use of the conviction to "diminish[ ] the prejudice to defendant" (*People v Young*, 115 AD3d 1013, 1014 [2014]; *see People v Wolfe*, 103 AD3d 1031, 1036 [2013], *lv denied* 21 NY3d 1021 [2013]; *People v Peele*, 73 AD3d 1219, 1220 [2010], *lv denied* 15 NY3d 894 [2010]), we have no quarrel with County Court's ruling on this point.

As for defendant's claim that County Court similarly abused its discretion in permitting the People to elicit testimony from Barsky regarding defendant's alcohol and marihuana use on the night of the attack, we note that defense counsel not only failed to object to such testimony but, when expressly asked by County Court whether he wished to be heard regarding whether such conduct constituted "bad act[s]," responded, "No." Accordingly, this issue is unpreserved for our review (*see People v Williams*, 89 AD3d 1222, 1224 [2011], *lv denied* 18 NY3d 887 [2012]). Moreover, even assuming such evidence was subject to a *Molineux* analysis (*see People v Molineux*, 168 NY 264, 293 [1901]), we would find such proof was "inextricably interwoven with the charged crime[ ], provide[d] necessary background or complete[d] a witness's narrative" and was, therefore, properly admitted (*People v Burnell*, 89 AD3d 1118, 1120 [2011], *lv denied* 18 NY3d 922 [2012] [internal quotation marks and citation omitted]; *accord People v Johnson*, 106 AD3d 1272, 1274 [2013], *lv denied* 21 NY3d 1043 [2013]). We reach a similar conclusion regarding defendant's September 2002 suggestion that Barsky collect and dispose of Martin's remains (*see People v Ballard*, 38 AD3d 1001, 1003 [2007], *lv denied* 9 NY3d 840 [2007]).

Nor do we find merit to defendant's claim that County Court erred in denying his request for a mistrial after Barsky made reference to the fact that, while undergoing questioning by the State Police in 2008, he was asked if he would be willing to undergo "a lie detector test." Defense counsel's immediate objection to such testimony was sustained, and County Court promptly instructed the jury to disregard any reference thereto. Inasmuch as Barsky neither disclosed whether he agreed to (or did in fact) take a polygraph test nor alluded to the results of any such test, we cannot say that County Court erred in denying defendant's motion for a mistrial upon this ground (*see People v Vredenburg*, 110 AD2d 730, 730 [1985]). Moreover, to the extent that such testimony could be construed as improper bolstering, we find any error in this regard to be harmless, as there is no significant probability that the jury would have acquitted defendant had it not heard the offending testimony

(*see People v Johnson*, 57 NY2d 969, 970 [1982]). Defendant's remaining contentions, including his assertion that the sentence imposed was harsh and excessive, have been examined and found to be lacking in merit.

Peters, P.J., Stein and Rose, JJ., concur. Ordered that the judgment is affirmed.