People v Slivienski (2022 NY Slip Op 02584)

People v Slivienski

2022 NY Slip Op 02584

Decided on April 21, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 21, 2022

112033
[*1]The People of the State of New York, Respondent,
v
Thomas Slivienski, Appellant.

Calendar Date:February 8, 2022

Before:Garry, P.J., Egan Jr., Pritzker, Colangelo and Ceresia, JJ.

Paul J. Connolly, Delmar, for appellant.
P. David Soares, District Attorney, Albany (Emily Schultz of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the Supreme Court (Lynch, J.), rendered November 22, 2019 in Albany County, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree.
On November 16, 2018, at approximately 10:00 p.m., the victim and four friends, Bryan Carpenter, Marquis Alston, Jeremy Shumway and John Gomes (hereinafter collectively referred to as the friends), went to the bike path located in the City of Cohoes, Albany County to purchase marihuana. In fact, the true plan was that the victim and the friends were to take the marihuana from the dealer without paying for it, which they had done in the past. The victim was in contact with the dealer, who directed the victim to meet him alone. The friends became apprehensive when the victim did not return, so Carpenter called him twice in a span of 10 minutes. During the second call, Carpenter heard someone speaking with the victim followed by gunshots. The victim was shot multiple times, resulting in his death. After an investigation in which defendant was identified as a suspect, he was arrested and subsequently charged by indictment with murder in the second degree and criminal possession of a weapon in the second degree. A jury trial ensued, after which defendant was found guilty as charged. Defendant was then sentenced to a prison term of 20 years to life for his conviction of murder in the second degree and to a lesser concurrent prison term for the other conviction. Defendant appeals.
Defendant first asserts that the verdict was legally insufficient and against the weight of the evidence because the evidence presented was fully consistent with his innocence and supported the conclusion that he was not the shooter. To establish murder in the second degree as charged in the indictment, the People were required to prove that defendant, "[w]ith intent to cause the death of another person, . . . cause[d] the death of such person or of a third person" (Penal Law § 125.25 [1]). Additionally, to establish criminal possession of a weapon in the second degree as charged in the indictment, the People were required to prove that defendant "possesse[d] any loaded firearm" (Penal Law § 265.03 [3] [b]).
As conceded by defendant, the only disputed element is identity. To that end, given the fact that this case involved a significant amount of circumstantial evidence, the testimony was voluminous and much of it concerned proving the identity of the shooter. The friends, except Alston, testified regarding the night of the murder and their testimonies largely corroborated each other, despite being separated upon the arrival of law enforcement. The friends who testified each confirmed that on November 16, 2018, they, along with the victim, attended Carpenter's baby shower and thereafter went to the bike path to obtain marihuana. Their plan was to "stain" the dealer, which the friends explained meant taking the marihuana [*2]without paying. According to Carpenter, the dealer initiated contact with the victim on Snapchat. The dealer changed the meeting location multiple times and the victim was told to come alone, so he walked ahead of the friends to a point where he could not be seen. During the second of two phone calls that Carpenter placed to the victim when he did not return, gun shots were heard from the direction of the victim, although there was a discrepancy in the testimony as to the number of gun shots heard. Upon running to and observing the victim, two of the friends ran to get help. Carpenter testified that he stayed with the victim for less than five minutes before running away because he was on probation for armed robbery. He explained that he was picked up by his mother who, approximately 20 minutes later, brought him to the Town of Colonie Police Department (hereinafter CPD) after his mother was contacted by a detective. Carpenter spoke to law enforcement and gave consent to search his phone. Carpenter testified that he and the victim knew defendant because the victim had "stained" defendant twice in the prior two years.
An investigator for the State Police testified that the Forensic Investigation Unit went to the crime scene at 1:30 a.m. and, after the initial walkthrough, the team found small metal fragments and cartridge cases that were later collected. The head stamp on the cartridge cases, which usually identifies the caliber and round of the bullet, indicated that the bullets were .40 caliber. A canine handler testified that he and his canine looked for a gun at the crime scene. He observed a single set of footprints that led south of the crime scene, so he and the canine conducted a track. The footprints almost followed the bike path and ultimately went down an unplowed road at a clearing near the Norlite quarry, which the canine handler believed led to the exit of the quarry. A resident of a house located near the bike path turned over photographs from two trail cameras located on his property which, at 10:07 p.m., near the time of the shooting, captured a photograph of a man. A CPD detective recovered surveillance video from the Saratoga Sites Housing Complex, which is near the Norlite quarry. At approximately 10:44 p.m., the video shows a silver Chevrolet Impala with a white taxi light. The taxi company was contacted and the driver confirmed that she was driving a gray or silver Impala and recalled picking up a fare for three girls who had been drinking between 10:00 p.m. and midnight. While driving, she was flagged down by a man believed to be exiting Saratoga Sites who asked for a ride to the Rite Aid in the City of Watervliet, Albany County. The driver described the man as being "[r]eally sweaty" and recalled that he sat in the front seat and was wearing a dark coat with his hood up. She identified this man as defendant. The three girls in the taxi confirmed the driver's testimony. Two of the girls testified to knowing [*3]the man, who they both identified as defendant.
There was no suspect initially, so an investigator with the Computer Crimes Unit of the State Police conducted searches of the phones of Carpenter, Alston, Shumway and the victim for anything relevant in the hours preceding the shooting. An advanced search of the victim's phone could not be completed due to physical damage, but the investigator could identify the phone number. There was lengthy testimony regarding the very extensive investigation into cell phone records and we will endeavor to touch on what we view to be the most significant portions of that testimony. It was ultimately determined that the victim's carrier for his cell phone was Verizon Wireless and, leading up to the time of his death, the victim was conversing with someone using a phone number ending in 6542 (hereinafter the unidentified phone number) regarding a plan to meet on the bike path. The unidentified phone number was ultimately sold to TextNow, which furnished the CPD with call and text message records as well as IP session logs pursuant to a warrant. The day before the murder, a text message was sent from the unidentified phone number to the victim's phone number confirming that it was the victim who was receiving the text messages from the unidentified phone number. The next morning, the victim indicated that he needed two ounces of marihuana. At 8:12 p.m., the unidentified phone number stated, "[m]eet on the bike path at 10," and instructed the victim not to bring anyone with him. There appeared to be a discussion of where exactly to meet and then, after 10:05 p.m., the victim's phone had no more live messages.
An employee of TextNow testified virtually that TextNow is an application that can be downloaded on smartphones, tablets or by computer, and it gives a person a real phone number, picked by the user, in the United States or Canada that allows a person to text for free. The TextNow employee provided records for the unidentified phone number that revealed that, around the time period of the murder, the unidentified phone number connected to the Internet using two IP addresses — one registered to Time Warner Cable and the other registered to Verizon Wireless. A subpoena was served on Time Warner, which identified that the IP address belonged to defendant's stepfather and provided his residence address, which police learned that he shares with defendant's mother. Verizon Wireless was also subpoenaed to provide the phone numbers using the Verizon Wireless IP address at certain time periods within the time frame that the unidentified number was using it. From this information, a phone number that was most frequently using the Verizon Wireless IP address was identified, which was determined to be registered to defendant. A search warrant was issued to Verizon Wireless, the carrier for defendant's cell phone, seeking various account records. Katherine Mooar, an analyst, then testified that she was tasked [*4]with looking at the location data for the victim's and defendant's phones. Mooar generated a report of the "mapping product" of the phones with which she tracked the location of defendant's cell phone based on its connection to cell towers between 7:31 p.m. and 11:46 p.m. on the night of the murder. At various times between 9:30 p.m. and 10:06 p.m., both phones were using cell towers near each other and the crime scene. After 10:06 p.m., the victim's phone number ceased utilizing cell towers because it was either powered off or destroyed. Between 10:07 p.m. and 11:46 p.m., defendant's cell phone was moving further away from a cell tower in Cohoes and was utilizing a tower east of the Hudson River.
Defendant was interviewed by police and provided a written statement wherein he denied any involvement in the victim's murder and denied having been anywhere near the bike path that night. In sum and substance, he stated that, around 7:00 p.m. the night of the murder, he went to his mother's house in Cohoes to see his son and stayed for about two hours. He averred that he waved down a taxi that took him to the Rite Aid in Watervliet and that he walked the rest of the way home. He stated that the latest he got home was about 10:00 p.m. A search warrant of defendant's residence was executed and a notebook was found in defendant's room with handwritten notes listing the name "otf__johni." Some physical evidence was brought to the lab for subsequent analysis, but no relevant DNA evidence was recovered from most of it. Defendant's cell phone was seized and, from his phone, his number was identified and a report was created showing that eight locations of data history had been deleted. Defendant's log history revealed that there was no activity on the phone prior to November 19, 2018 at 12:24 a.m., which led to the conclusion that it had been factory reset, which erased the contents of the phone. A Snapchat account with the username "hitsquadbrim" was also identified, which a search warrant revealed belonged to defendant. The Snapchat account of the victim was also reviewed, which included the username "otf__Johni."
Upon analysis of the projectiles recovered from the victim, it was determined that the bullets had an appearance consistent with a hollow-point round bullet. A video of defendant shooting a gun at a property located in the Town of Lake George, Warren County (hereinafter the property) in the summer of 2018 was admitted into evidence and shown to the jury. Dominic Barbuto, a former friend of defendant, stated that defendant brought his .40 caliber pistol to the property in the summer of 2018. He indicated that the barrel was a "black gray material" and the handle was "blacker." Barbuto recalled seeing this gun multiple times while spending time with defendant and remembered defendant possessing bullets with "hollow tips." Barbuto recalled seeing defendant with the pistol multiple times after they were in Lake George, including at [*5]defendant's apartment. He acknowledged that he has brought other friends to the property to shoot guns but believed others shot primarily "hunting rifles or any hunting kind of gun." He conceded that he was unaware if defendant still possessed the gun after October 2018 when the friendship between the two ended. Cartridge cases were recovered from the property and submitted for ballistics testing. A total of 48 cartridge cases were collected with 27 being .40 caliber. Only the cartridge cases from the .40 caliber bullets were sent for analysis because they were the same caliber as those recovered from the bike path.
Maria Rauche, a forensic scientist and firearms tool mark examiner, testified that she received five cartridge cases and three bullets for analysis that were recovered from the scene of the murder and from the victim's body, respectively. Rauche was able to identify that the two intact bullets from the victim's body were .40 caliber and fired from the same firearm. Rauche testified that she also examined the .40 caliber cartridge cases recovered from the property and she observed that they were all ".40 Smith [and] Wesson caliber," but had different manufacturers. She conducted a microscopic comparison of the cartridge cases from the property and compared them to the cartridge cases from the crime scene and, in her opinion, there was a sufficient agreement of repeatability of the characteristics between them. Based on her analysis, she concluded that the cartridge cases from the property were fired from the same firearm as those from the crime scene. When cross-examined, she stated that her opinion is completely based on a visual comparison and a computer did not analyze the results. She conceded that two qualified firearms examiners could come to different conclusions, however, her analysis was reviewed by another firearms examiner who verified her results.
Derek Maloney, a friend of defendant, testified that he was with defendant a few days after the shooting and defendant was "pacing back and forth through the house," biting his fingernails and looking out the window. Maloney mentioned the victim's murder and defendant responded that he had "bad blood with the kid," called the victim a "scumbag" and mentioned the fact that the victim had robbed him before. Maloney recalled that defendant was in possession of a gun at the apartment, which he described as having a black handle and that "the top of [the gun]" was silver.[FN1] He stated that defendant was posing for pictures with the gun, including taking a photograph while pointing the gun at the camera. Maloney also recalled that defendant would brag about getting hollow-tip bullets. Finally, Maloney indicated that both he and defendant used the application TextNow.
Based on the foregoing, when construing the evidence in the light most favorable to the People as we must, a rational person could conclude that the shooter's identity was sufficiently proven to be defendant[*6](see People v Sweet, 200 AD3d 1315, 1315-1316 [2021], lv denied 38 NY3d 930 [2022]; People v Watson, 174 AD3d 1138, 1139 [2019], lv denied 34 NY3d 955 [2019]). In this case, the testimony of multiple witnesses, including Rauche, provided strong circumstantial evidence that the weapon that defendant previously fired was the same weapon that killed the victim. The cartridge cases located at the scene were determined to be fired from the handgun used in the Lake George video, which others testified belonged to defendant. Further, defendant was seen on numerous occasions after he was in Lake George with the handgun, which would lead a rational person to conclude that he possessed the gun on the day of the shooting (see People v Sweet, 200 AD3d at 1317-1319). This evidence, combined with, among other things, the cell phone records and mapping, which placed defendant in the area of the bike path at the time of the murder, was sufficient to meet the People's burden to establish identity. As to the weight of the evidence, although a different verdict would not have been unreasonable, when viewing all of the evidence in a neutral light and deferring to the jury's credibility determinations, we find that the weight of the credible evidence supports the conclusion that defendant was the shooter (see People v Barzee, 190 AD3d 1016, 1019 [2021], lv denied 36 NY3d 1094 [2021]; People v Rawlinson, 170 AD3d 1425, 1428 [2019], lv denied 33 NY3d 1107 [2019]). Thus, the verdict as to both murder in the second degree and criminal possession of a weapon in the second degree was supported by the weight of the evidence (see id.).
Defendant also contends that Supreme Court erred in denying his motion to suppress the statements he made during the police interview since he unambiguously invoked his right to remain silent. We agree. "If a person who is subject to police interrogation 'indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent, the interrogation must cease'" (People v Colon, 185 AD3d 1510, 1511 [2020], lv denied 35 NY3d 1093 [2020], quoting Miranda v Arizona, 384 US 436, 473-474 [1966]; see People v Ferro, 63 NY2d 316, 322 [1984], cert denied 472 US 1007 [1985]). "[A] defendant's invocation of the right to remain silent must be scrupulously honored once the right is asserted in an unequivocal and unqualified fashion" (People v Johnson, 106 AD3d 1272, 1275 [2013] [internal quotation marks and citations omitted], lvs denied 21 NY3d 1043, 1045, 1046 [2013]). "Whether that request was unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request, including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (People v Zacher, 97 AD3d 1101, 1101 [2012] [internal quotation marks and citations omitted], lv denied 20 NY3d 1015 [2013]; see People v Johnson, 106 AD3d at 1275). [*7]"[The defendant] may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime" (People v Ferro, 63 NY2d at 322; see People v Vinson, 199 AD3d 942, 943 [2021], lv denied 37 NY3d 1165 [2022]).
Here, there is no dispute that, after being arrested and while on the way to the police station, defendant was advised of his Miranda rights and waived them. Upon arriving at the police station, while being frisked, defendant stated, twice, that he did not "want to talk anymore," which we find to be a clear and unequivocal invocation of his right to remain silent (see People v Henry, 133 AD3d 1085, 1087 [2015]; compare People v Horton, 46 AD3d 1225, 1226 [2007], lv denied 10 NY3d 766 [2008]). Given this unequivocal invocation of his right to remain silent, the police violated that right when, mere minutes later and without any further Miranda warnings, they continued to interrogate him (compare People v Vinson, 199 AD3d at 943; People v Williams, 184 AD3d 1010, 1013 [2020], lv denied 35 NY3d 1097 [2020]). However, given the overwhelming proof of defendant's guilt, as well as the fact that most, if not all, of defendant's statements to the investigators were exculpatory, there is no reasonable possibility that the error might have contributed to defendant's conviction; thus, we would find that this error was harmless beyond a reasonable doubt (see People v Ortiz, 37 NY3d 1157, 1158 [2022]; People v Romero, 27 NY3d 981, 982 [2016]; People v Colon, 185 AD3d at 1512).
Defendant also argues that the search warrant served on TextNow seeking defendant's cell phone records, including IP address information, was unlawful and that the records disclosed should be suppressed. Preliminarily, "'[a] defendant seeking suppression of evidence has the burden of establishing standing by demonstrating a legitimate expectation of privacy in the premises or object searched'" (People v Logan, 198 AD3d 1181, 1183 [2021], lv denied 37 NY3d 1162 [2022], quoting People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996]; see US Const, 4th Amend; NY Const, art I, § 12). "A legitimate expectation of privacy exists where [the] defendant has manifested an expectation of privacy that society recognizes as reasonable. Thus, the test has two components. The first is subjective — did [the] defendant exhibit an expectation of privacy in the place or item searched, that is, did he [or she] seek to preserve something as private. The second component is objective — does society generally recognize [the] defendant's expectation of privacy as reasonable, that is, is his [or her] expectation of privacy justifiable under the circumstances" (People v Ramirez-Portoreal, 88 NY2d at 108 [citations omitted]). "'[A] person has no legitimate expectation of privacy in information he [or she] voluntarily turns over to third parties'" (Carpenter v United States, ___ US ___, ____, 138 S Ct 2206, 2216 [2018], quoting Smith v Maryland, 442 US [*8]735, 743-744 [1979]), and this analysis does not change "'even if the information is revealed on the assumption that it will be used only for a limited purpose'" (Carpenter v United States, 138 S Ct at 2216, quoting United States v Miller, 425 US 435, 443 [1976]).
Supreme Court found, and defendant concedes, that, based upon the aforementioned case law, one has no reasonable expectation of privacy in an IP address that a person uses to access the Internet when a third party holds that information. However, he argues that he sought to preserve his identity as private by choosing TextNow, rather than an ordinary texting service via his normal cell phone carrier that would associate his name with his phone number. Although defendant may have established the first prong of the analysis by arguing that he had a subjective expectation of privacy, we find that he has not established the second prong as it is wholly unreasonable that society would accept this expectation as reasonable (see People v Ramirez-Portoreal, 88 NY2d at 108; see generally People v Logan, 198 AD3d at 1184), and defendant has not cited to any authority which states otherwise. Therefore, Supreme Court properly found that defendant did not have an expectation of privacy in said IP addresses and lacked standing to seek suppression.[FN2]
Defendant further contends that the video evidence of him shooting a gun at the property should have been excluded as improper Molineux evidence. "'Molineux analysis is limited to the introduction of a prior uncharged crime or a prior bad act'" (People v Frumusa, 29 NY3d 364, 369 [2017], quoting People v Brewer, 28 NY3d 271, 276 [2016]). It is well settled that "the common thread in all Molineux cases is that the evidence sought to be admitted concerns a separate crime or bad act committed by the defendant" (People v Frumusa, 29 NY3d at 369-370). With that being said, when the evidence is relevant to the crime charged, the danger that a jury may draw an improper inference based on propensity is not present since no separate crime or bad act is before the jury (see id. at 370; People v West, 166 AD3d 1080, 1088 [2018], lv denied 32 NY3d 1129 [2018]).
In the video, defendant is heard screaming, "freeze, gun," followed by him firing several bullets towards a tree. The People believed this video put the murder weapon in defendant's hands. The People acknowledged that other cartridge cases were located at the property, although the cartridge cases were primarily .40 caliber and matched those found at the crime scene. Ultimately,[FN3] Supreme Court determined that the "true character" of the proffered evidence is that it is "direct evidence that defendant had access to, possession of, and trained in the use of the same .40 caliber firearm used in the charged crimes." We agree. The sole element of the charged crimes that was challenged at trial was identity. The purpose of this direct evidence was to prove that the identity of the shooter for the present [*9]crime was defendant; this was not evidence related to a separate crime or bad act for which there is a danger that the jury could draw an improper inference of propensity (see People v Frumusa, 29 NY3d at 370; People v Brewer, 28 NY3d at 276).
Moreover, that Supreme Court, when viewing this evidence as Molineux evidence, found it to be more prejudicial than probative (see People v Alvino, 71 NY2d 233, 242 [1987], citing People v Ventimiglia, 52 NY2d 350, 359 [1981]), does not mean that it must also be excluded when it is direct evidence. Indeed, when conducting the discretionary balancing required for Molineux evidence, or evidence of a separate crime, there is a much higher risk of prejudice as "it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his [or her] past" (People v Alvino, 71 NY2d at 241). By contrast, "[w]here, as here, the evidence at issue is relevant to the very same crime for which the defendant is on trial, there is no danger that the jury will draw an improper inference of propensity because no separate crime or bad act committed by the defendant has been placed before the jury" (People v Frumusa, 29 NY3d at 370). To that end, given that this evidence is highly probative because it goes to establishing the identity of the shooter - the sole contested element at trial - this probative value outweighs the "danger of unfair or undue prejudice" to defendant (People v Frumusa, 29 NY3d at 372; see e.g. People v Cromwell, 71 AD3d 414, 414-415 [2010], lv denied 15 NY3d 803 [2010]). Although a limiting instruction would have minimized any potential prejudice to defendant, one was not requested; thus, we cannot address that issue (see People v Frumusa, 29 NY3d at 373; People v Chappell, 198 AD3d 1018, 1020 [2021], lv denied 37 NY3d 1160 [2022]).[FN4]
Defendant also asserts that Supreme Court did not use the correct standard for materiality, which led to an erroneous denial of his Brady claim in his CPL article 330 motion. Under Brady, as relevant here, the People are required to "timely disclose all exculpatory and material evidence, including evidence that could be used to challenge the credibility of a crucial prosecution witness" (People v Carter, 131 AD3d 717, 718 [2015] [internal quotation marks and citations omitted], lv denied 26 NY3d 1007 [2015]). For a defendant to succeed on such a claim, he or she "must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Giuca, 33 NY3d 462, 473 [2019] [internal quotation marks and citations omitted]).
In his motion to set aside the verdict, defendant noted that the People revealed that Rauche, who testified as a forensics expert regarding ballistics evidence, had been in a car accident in August 2019, two months before the trial, and this may [*10]have affected her peripheral vision and memory. The People opposed, noting that all of the reports created by Rauche were made before the car accident, the prosecutor never found her to be impaired or in pain during preparation and Rauche explained her memory loss as taking longer to find the correct word when speaking.[FN5] As Supreme Court correctly noted, the first two prongs of Brady were satisfied, but defendant failed to establish the materiality element (see id.). Specifically, because it is unlikely that Rauche would have been impeached even if this testimony had been elicited, there is no "reasonable possibility that disclosure of the evidence would have changed the result of the proceeding[]" (id., citing People v Vilardi, 76 NY2d 67, 77 [1990]). Given the fact that disclosure was immaterial, Supreme Court properly denied defendant's CPL article 330 motion to set aside the verdict (see CPL 330 [3]; People v Hightower, 186 AD3d 926, 931 [2020], lv denied 35 NY3d 1113 [2020]).
Finally, defendant's assertion that he was deprived of the effective assistance of counsel based on a few alleged errors is without merit because, even if we were to agree that these failings were "errors," we do not find them to be "so grievous as to amount to a deprivation of the constitutional right to a fair trial" (People v Brabham, 126 AD3d 1040, 1043 [2015], lvs denied 25 NY3d 1160, 1171 [2015], citing People v Henry, 95 NY2d 563, 565-566 [2000]). "Viewing the overall record, we find that counsel provided a vigorous and cogent trial strategy, albeit one ultimately not credited by the jury, . . . made appropriate pretrial motions, and effectively cross-examined witnesses and challenged the scope of the evidence admitted, thereby providing defendant with meaningful representation" (People v Kalabakas, 183 AD3d 1133, 1145 [2020] [citations omitted], lv denied 35 NY3d 1067 [2020]). Defendant's remaining contentions, to the extent not specifically addressed herein, have been examined and found to lack merit.
Garry, P.J., Egan Jr., Colangelo and Ceresia, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: On cross-examination, Maloney conceded that he did not know guns well and would not be able to tell the difference between a real gun and a BB gun.

Footnote 2: We are unpersuaded by defendant's further argument that Supreme Court violated defendant's right to confrontation by permitting the TextNow representative to testify virtually via two-way remote video, as the court made the requisite findings of necessity and reliability (see People v Wrotten, 14 NY3d 33, 39-40 [2009], cert denied 560 US 959 [2010]; People v Giurdanella, 144 AD3d 479, 480-481 [2016], lv denied 29 NY3d 948 [2017]).

Footnote 3: The People made a Molineux proffer pretrial seeking to have the video admitted. Supreme Court initially found that the People had not met their burden of establishing that the evidence fell within one of the Molineux exceptions and that, even if they had, the evidence was more prejudicial than probative and excluded it. However, it then issued a supplemental decision finding the video to be direct evidence rather than Molineux. "That the People classified it as Molineux evidence, and the trial court [initially] considered it on that basis, does not prevent" Supreme Court or this Court from concluding that it was not (People v Frumusa, 29 NY3d at 370 [internal quotation marks and citation omitted]).

Footnote 4: Defendant's additional arguments that evidence regarding defendant's gun in locations other than Lake George and defendant's Snapchat username deprived defendant of a fair trial are similarly unpreserved (see CPL 470.05 [2]; People v Wright, 5 AD3d 873, 875 [2004], lv denied 3 NY3d 651 [2004]).

Footnote 5: At oral argument on defendant's motion, the People noted that they were not aware of any memory loss until after trial.