98 N.Y.2d 280 (2002)
774 N.E.2d 716
746 N.Y.S.2d 651
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
KEVIN JENKINS, Appellant.
Court of Appeals of the State of New York.
Argued May 2, 2002.
Decided June 13, 2002.
*281 Erica Horwitz, New York City, and Lynn W.L. Fahey for appellant.
Charles J. Hynes, District Attorney, Brooklyn (Morgan J. Dennehy and Leonard Joblove of counsel), for respondent.
Judges LEVINE, CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur with Judge SMITH; Chief Judge KAYE dissents and votes to reverse in a separate opinion.

OPINION OF THE COURT
SMITH, J.
The issue here is whether the trial court abused its discretion by denying defendant's motion for preclusion of evidence contained in a ballistics report that was allegedly first disclosed after defendant had begun to present his defense. Because we conclude that the trial court did not abuse its discretion and defendant was not unduly prejudiced, we affirm the order of the Appellate Division.
Defendant was convicted of second degree murder and sentenced to 25 years to life in prison for events occurring on March 31, 1992 in Brooklyn. The People introduced evidence that the deceased, Mark Carroll, told Carl Grant that he could no longer sell drugs on a particular corner because Carroll and his friends wanted to sell drugs there. Shortly thereafter, Grant returned to the corner with several other persons. Carroll and Grant began to fight and while they were fighting, defendant pulled a gun from his jacket and fired several shots. Carroll was shot and killed and three others were wounded.
*282 According to the prosecution, defendant was the sole gunman. Defendant, however, contended that the eyewitnesses to the shooting had falsely identified him as the shooter. Defendant also argued that there were several shooters involved in the incident and that the decedent had been caught in a crossfire between the rival groups.
There is no question that the People disclosed the existence of a ballistics report in their voluntary disclosure form dated October 1, 1997 and that defendant asked for any ballistics report in his omnibus motion, dated October 30, 1997 and returnable January 8, 1998. In addition, by demand to produce and by facsimile, both documents dated October 30, 1997, the defense attorney specifically requested ballistics reports. In a reply to the omnibus motion, dated January 7, 1998, the prosecutor stated that the ballistics report would be produced prior to the opening statement. Nevertheless, defense counsel did not seek a court order for production of the ballistics report.
Although defendant did not make an opening statement, he did cross-examine the medical examiner and a police officer who investigated the crime scene before he contended that he had not received the ballistics report. The People turned over to him a ballistics report which showed that 20 shells of the same caliber were discovered at the scene of the crime and came from one gun. Defense counsel urged the trial court to preclude the evidence, arguing that the prosecutor violated Criminal Procedure Law § 240.20 by allegedly failing to disclose the ballistics report before the commencement of trial despite the prosecution's contention to the contrary. Defense counsel argued that he was prejudiced by the delay in receiving the ballistics report.[1]
In opposition, the prosecutor argued that he had timely disclosed the ballistics report when he turned over two large packets of material of approximately 500 pages prior to trial.[2] The items turned over were not identified on the record. The People agreed, notwithstanding the disputed pretrial disclosure, to provide defense counsel with a copy of the report. Upon *283 receipt of the document, defense counsel again moved to have the evidence precluded, claiming that the report had never been disclosed and that if counsel had known of its contents, he never would have questioned the witnesses about the number of weapons used in the incident and the location of the shooters. Defense counsel argued further that the report undermined his attempt to show that the victim had been killed in a crossfire of bullets that had been fired by two groups of rival drug dealers.
Without determining whether the report had been disclosed, the trial court offered to adjourn the case to allow the defense to review the evidence and retain an independent ballistics expert. Defense counsel declined the offer. Next the court reviewed the People's "copy"[3] of what was provided to defendant, after which the court denied defendant's motion to preclude testimony about the contents of the ballistics report. The court found that even if the prosecutor failed to timely disclose the report, defendant had not been prejudiced by the late disclosure.
The Appellate Division affirmed by a three to one vote, concluding that even if the People had untimely disclosed the ballistics report, there was no showing of prejudice or bad faith to justify precluding the prosecution from presenting the evidence contained in the ballistics report. The majority observed that although the ballistics report indicated that all 20 shell casings found at the scene came from the same gun, the ballistics expert was unable to say a bullet recovered from Carroll's body or another bullet fragment found at the scene were fired from the same gun as the casings. Thus, according to the majority, there could have been as many as three guns involved in the shooting, which is consistent with the theory of the defense. Consequently, the alleged late disclosure did not preclude defendant from pursuing his multiple shooter defense.
The dissenting Justice concluded that defendant was entitled to a new trial if he, in fact, did not receive the ballistics report until the trial because at that point, the theory of the defense was severely weakened and almost completely refuted by the ballistics evidence. Consequently, defendant suffered significant prejudice. We disagree and therefore affirm.
Section 240.20 (1) (c) of the Criminal Procedure Law requires that the People, upon demand, produce for defendant "[a]ny *284 written report or document, or portion thereof, concerning a * * * scientific test or experiment, relating to the criminal action or proceeding which was made by, or at the request or direction of a public servant engaged in law enforcement activity" (CPL 240.20 [1] [c]). Section 240.20 requires the People to furnish the items when sought by the defendant (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 240.20, at 339 [2002 ed]). Section 240.70 of the Criminal Procedure Law provides that if a party fails to comply with the discovery mandates, the court "may order such party to permit discovery of the property not previously disclosed, grant a continuance, issue a protective order, prohibit the introduction of certain evidence or the calling of certain witnesses or take any other appropriate action" (CPL 240.70 [1]).
Preclusion of evidence is a severe sanction, not to be employed unless any potential prejudice arising from the failure to disclose cannot be cured by a lesser sanction. "[T]he overriding concern must be to eliminate any prejudice to the defendant while protecting the interests of society" (People v Kelly, 62 NY2d 516, 520 [1984]). The appropriate sanction to be imposed is within the sound discretion of the trial court and is not to be disturbed unless it is determined that there has been an abuse of that discretion.
Although the ballistics report indicated that all the shell casings found at the scene came from the same gun, the ballistics expert could not conclude that a bullet recovered from the victim's body or a bullet fragment recovered from the scene were fired from the same gun as the casings, and thus, the defendant was still able to, and did, pursue his defense that there were multiple shooters, any one of whom could have fired the fatal shots. Even though the defense attorney knew from the voluntary disclosure form that a ballistics report existed and he asked for it, he did not renew his request. He proceeded to question witnesses without it. It cannot be said that, on this record, defendant was unduly prejudiced and that preclusion of the ballistics evidence was required. Moreover, the exclusion of such evidence would severely compromise the truth-seeking function of the trial. Further, in fashioning what it deemed to be an appropriate remedy, the trial court offered to adjourn the case to allow defendant an opportunity to review the evidence and to retain his own expert witness, an offer which defendant rejected.
This case is unlike People v Thompson (71 NY2d 918 [1988]), where the untimely disclosure of Rosario material completely *285 negated the defendant's sole defense. In that case, the prosecution failed to disclose a statement given by the complainant to a police officer at a hospital within hours of the crime. Defense counsel attempted to show inconsistencies in complainant's trial testimony and other pretrial statements. Complainant's trial statements were, however, consistent with the undisclosed statement. This Court found the defendant substantially prejudiced and ordered a new trial (see also People v Evans, 111 AD2d 830 [1985] [untimely disclosure effectively negated the foundation of the defense theory]). Here, the purported untimely disclosure did not prevent defendant from contesting the People's theory that he was the lone shooter.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge KAYE (dissenting).
After a jury trial, defendant was convicted of intentional murder in connection with a shooting on a Brooklyn street corner in 1992. Evidence at trial showed that there was a dispute between two groups of men, ages 15 to 25, about which was going to use that particular corner for selling drugs. After a fistfight broke out between one member of each group, one of the combatants was shot and killed in a hail of bullets as everyone scattered. According to the People, defendant was the sole shooter.
In October 1997, three weeks after defendant's arraignment and almost a year before trial, defense counsel sent a fax to the prosecutor specifically requesting copies of any ballistics reports. That same day defense counsel made an omnibus motion, incorporating his demand to produce, which requested "[a]ny written report" concerning a "scientific test." In response, the People stated that "[d]iscovery will be produced prior to opening statements."
Trial began in September 1998. From Day One, defense counsel began cultivating the theory that more than a single gun and a single assailant were involved in the crime. Cross-examined by defense counsel, the Medical Examiner testified that the victim's wounds indicated that he had been shot from three different directions, and that the wounds "could [have] come * * * from similar but just different guns." Defense counsel also elicited the following admissions from a Crime Scene Unit detective:
"[Defense counsel]: You aren't able to say, are you, Detective, how many guns from which [the] shells were discharged, isn't that true?

*286 "[Detective]: That's true.
"[Defense counsel]: You are not able to say the number of perpetrators who fired those guns from the shells you recovered, correct?
"[Detective]: That's correct.
"[Defense counsel]: You aren't able to say whether or not the shells were discharged from more than one gun, correct?
"[Detective]: That's correct."
The detective acknowledged that the casings could have come from a nine-millimeter or a .380 caliber weapon, and from automatic or semiautomatic weapons. Defense counsel's questioning then underscored the probative valueand absenceof a ballistics report:
"[Defense counsel]: It is possible, is it not, Detective, to take discharged shells and do a microscopic comparison of those shells to see whether or not they were fired from the same gun, isn't that true?
"[Detective]: That is true. * * *
"[Defense counsel]: If [the shells] are similar, the conclusion might be that they came from the same gun, correct?
"[Detective]: Correct.
"[Defense counsel]: If they are dissimilar, the conclusion might be that they came from one or more guns that were different, correct?
"[Detective]: That's correct.
"[Defense counsel]: Do you know whether a microscopic comparison of discharged shells was done in this case?
"[Detective]: I don't know.
"[Defense counsel]: And you have no report with respect to that?
"[Detective]: No."
Two days later, after three witness had testified, defense counsel notified the Trial Judge that there was a ballistics expert listed on the People's witness list, though he had never *287 received a ballistics report. The prosecutor responded that they had already produced the report and would bring over another copy from the office. The prosecutor explained that two thick files had been turned over to defense counsel "before the trial began with all the Rosario in it."
The following daythe fourth day of trial, after four more witnesses had testifieda copy of a ballistics report surfaced, revealing to defense counsel for the first time the determination that all 20 shell casings had been fired from one gun. Defense counsel requested preclusion of any testimony regarding the report, noting that he had requested ballistics tests in his omnibus motion and on numerous occasions in the months following the indictment but had never received it. The prosecutor maintained that the report had been turned over two weeks earlier as part of two four-inch-thick manila envelopes of documents.
Whether the report was indeed made available earlier which defendant deniesis a question that remains unresolved. The Trial Judge, affirmed by a majority at the Appellate Division and now by this Court, has determined that, even if the report was not produced until the fourth day of trial, defendant suffered no prejudice. I cannot agree. Late production of the ballistics report undermined counsel's trial theory and substantially discredited the defense. I would reverse and remit to the trial court to determine the open question regarding production of the ballistics report.
After the Trial Judge denied defense counsel's request to preclude testimony regarding the report, the Ballistics Unit detective took the stand and testified that "without a doubt" the 20 shell casings "definitely" came from one gun "to the exclusion of any other gun." He further testified that the bullet recovered from the body came from the same caliber gun as the 20 casings, and that the bullet fragment recovered at the scene had very similar characteristics to the bullet recovered from the body. The ballistics evidence, then, established that the 20 casings were from one gun, and that the recovered bullet and fragment most likely also came from that same gun.
As defense counsel argued, "[i]f I had had this [report] and [it] had said 20 bullets came from one gun, I would not have asked those [earlier] questions, because clearly [the report] is a smoking gun * * * I shouldn't be penalized by not having material I need to properly prepare my case." Simply put, defendant was blind sided, midtrial, by scientific proof undermining *288 his defense. As we have stated: "The criminal discovery procedure embodied in [CPL] article 240 * * * evinces a legislative determination that the trial of a criminal charge should not be a sporting event where each side remains ignorant of facts in the hands of the adversary until events unfold at trial" (People v Copicotto, 50 NY2d 222, 226 [1980]).
The majority's statement that the defense attorney knew a ballistics report existed but was not disclosed and thus, in effect, proceeded to question witnesses at his own risk (majority op at 284) misses the point. Defendant specifically requested the report at least twice and did not receive it. He is not required to ask repeatedly for the People to comply with discovery requirements or else assume the risk that the People have crucial evidence that has not been produced. And that counsel continued to pursue the multiple-shooter defense does not indicate a lack of prejudice to the defendant's casehe may have understandably felt it was simply too late to change course. As Justice Goldstein aptly noted below, "the fact that the defendant was still able to pursue a defense that was significantly weakened and ultimately unsuccessful does not diminish the fact that the defendant suffered significant prejudice" (People v Jenkins, 284 AD2d 550, 552 [Goldstein, J., dissenting] [internal quotation marks omitted]).
Finally, repeated specific requests, an alleged turnover of hundreds of pages of unidentified, undifferentiated material in two thick envelopes, and then the appearance of ballistics reports on the fourth day of trial, was no way for the People to discharge their serious obligation to turn over documents. I see no excuse for failing to make timely document production, without burdening the parties or the courts with the need for orders. And I see no excuse for failing to create some sort of readily verifiable record of what has been turned over, by simple measures like numbering pages and listing documents. What is at stake is simply too important for anything less.
Order affirmed.
NOTES
[1] Although the incident occurred in 1992, defendant was not arrested until 1997 in Georgia where he was living under another name. By that time, the detective who had conducted the original ballistics tests had retired. Shortly before the trial began, another detective performed ballistics tests and testified at trial.
[2] We note that the better practice is for the prosecutor to provide to the defense attorney and the court a list or some other means of identifying the materials turned over.
[3] This was not a true photocopy, but rather the prosecutor's duplicate version of what he allegedly provided to defendant in pretrial disclosure.