People v Sweet (2021 NY Slip Op 07031)





People v Sweet


2021 NY Slip Op 07031


Decided on December 16, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 16, 2021

111100
[*1]The People of the State of New York, Respondent,
v
Garry L. Sweet, Appellant.

Calendar Date:October 14, 2021

Before:Garry, P.J., Egan Jr., Aarons, Reynolds Fitzgerald and Colangelo, JJ.

Thomas F. Garner, Middleburgh, for appellant.
Lorraine C. Diamond, District Attorney, Fonda (Christina Pearson of counsel), for respondent.



Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Montgomery County (Catena, J.), rendered April 19, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree and conspiracy in the second degree.
In June 2018, the victim was shot and killed on the porch of his apartment. In October 2018, defendant, Eric S. Rivera and Aaron Cockfield Jr. were each charged, by a joint indictment, with murder in the second degree and conspiracy in the second degree.[FN1] Following a jury trial, defendant was convicted as charged. County Court thereafter sentenced him to a prison term of 25 years to life on the murder conviction, and 8&frac13; to 25 years on the conspiracy conviction.[FN2] Defendant appeals.
Defendant contends that his conviction for murder in the second degree is not supported by legally sufficient evidence as the People failed to establish intent. Additionally, he alleges that the verdict on both counts is against the weight of the evidence, as the testimony of his codefendants was not credible, and the People failed to produce physical evidence connecting him to the murder. "[A] legal sufficiency challenge requires this Court to view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crimes charged" People v Pentalow, 196 AD3d 871, 873 [2021] [internal quotation marks, brackets and citations omitted]; see People v Acosta, 80 NY2d 665, 672 [1993]). "In contrast, when undertaking a weight of the evidence review, [this Court] must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v McCabe, 182 AD3d 772, 773 [2020] [internal quotation marks, brackets and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). As relevant here, "[a] person is guilty of murder in the second degree when[,]
. . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]). Murder in the second degree is a class A-I felony (see Penal Law § 125.25). "A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he [or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.15).
At trial, the victim's girlfriend testified that at around 8:00 p.m. on June 29, 2018, the victim left the residence that they shared. The following morning, she discovered him dead [*2]outside on the porch lying on his back in a pool of blood. A friend of Rivera testified that she allowed Rivera and defendant to take her vehicle and that defendant told her that they were going to "confront" the victim. Cockfield, who testified at trial as a condition of his plea bargain, stated that, prior to him meeting up with them, defendant and Rivera had formulated a plan to harm the victim, which was, in essence, to "[get the victim] before he [got them]." In addition, defendant specifically stated that they needed to "shoot" the victim. According to Cockfield's testimony, his role in the plan was to be the driver. He testified that he drove defendant and Rivera to a barn, defendant entered the barn and then, after exiting, defendant fired a gun — which Rivera told him was a 9 millimeter — into the air five or six times. Defendant then instructed Cockfield to drive to a warehouse, where defendant and Rivera changed their clothes, and then he drove to the victim's apartment where defendant instructed him to park on a nearby street. Cockfield further testified that he heard multiple gunshots and, shortly thereafter, defendant and Rivera jumped into the car; he saw that Rivera had a gun on his hip. Defendant asked, "Did you see what I did?", to which Rivera responded, "Yeah[,] I was right there."
Defendant's employer, who also testified pursuant to a cooperation agreement with the People, stated that he owned a barn where he kept guns and pistols with ammunition, including a Walther 9 millimeter, that defendant had keys to the barn and that defendant also knew where a spare key was kept. He further testified that about two months after the murder, he and defendant's girlfriend drove together to the intersection of Fox Road and Route 5 in Montgomery County to retrieve the gun, which defendant's girlfriend took to her house. About a month later, defendant's girlfriend contacted defendant's employer requesting that the gun be removed from her home. He and the girlfriend took the gun and drove to Starkville, Herkimer County where they buried what he believed to be his Walther 9 millimeter gun.
Defendant's girlfriend testified, pursuant to a plea deal, that on June 30, 2018, she went to the City of Gloversville, Fulton County to the home of defendant's aunt and uncle for a cookout. During the course of the evening, defendant became aware that he was wanted by the police with regard to the victim's shooting, and he confessed to her that "he did it," specifically stating that "he shot [the victim] in the back of the head." Defendant then explained to her where the gun was and asked her to contact his employer to "get rid of [the gun]." She further testified that she and defendant's employer ultimately retrieved the 9 millimeter gun from Fox Road, she "cleaned it with bleach and ammonia . . . [t]o get rid of fingerprints and evidence" and "[took] the clip out of the gun," at which point she "noticed that there was a bullet missing." [*3]She wrapped the gun in a towel and, on September 20, 2018, she and defendant's employer buried the gun in Starkville.
Rivera, who also testified for the People in accordance with his plea deal, stated that he borrowed around $150 from the victim for marihuana and explained that he planned to repay the money either directly to the victim or through defendant. As he had not repaid the money to the victim, the victim threatened him on Facebook. On June 29, 2018, Rivera met defendant at a friend's house, and defendant suggested shooting the victim. After Cockfield arrived at the friend's house, he, defendant and Rivera left and drove to a barn. Rivera and defendant entered the barn using defendant's key and defendant took a 9 millimeter gun and a .22 caliber semiautomatic gun, both of which were loaded with ammunition. Once outside the barn, defendant shot the 9 millimeter gun into the air about six times. Rivera and defendant returned to the vehicle and the three of them drove to the victim's house; Cockfield parked the car and Rivera and defendant exited the vehicle with their guns. He went to the victim's home and engaged him in a conversation on the porch. Defendant appeared behind the victim and, as the victim was leaving the porch, defendant "shot him in the back of the head" with the 9 millimeter gun. Rivera and defendant then ran to the vehicle and the three of them drove to Cockfield's girlfriend's house.
A State Police investigator testified that a search for the 9 millimeter gun was conducted several times, but the gun was not recovered. A state trooper testified that he was called to collect evidence from the barn and recovered seven bullet casings. A second investigator with the State Police testified that he performed mobile forensics on defendant's cell phone where he found text messages related to transportation from
"G-ville" and "Fox Road," Google searches dated June 30, 2018 relative to whether the police could "ping" his phone, and Google searches dated July 1, 2018 regarding the safety mechanisms of a "Walther P99" weapon. The last witness was an individual incarcerated with defendant during December 2018, who testified that defendant told him about his and his codefendants' plan to "execute" the victim and admitted to shooting the victim with a "Walther [9] millimeter P88."
As the intent to commit murder may be inferred from defendant's actions and surrounding circumstances (see People v Rouse, 34 NY3d 269, 274 [2019]; People v Taylor, 196 AD3d 851, 852 [2021], lvs denied 37 NY3d 1025, 1030 [2021]), we find legally sufficient evidence to establish that defendant possessed the requisite intent to shoot and kill the victim (see People v Stover, 178 AD3d 1138, 1143-1144 [2019], lv denied 34 NY3d 1163 [2020]; People v Reese, 166 AD3d 1057, 1060 [2018], lv denied 33 NY3d 953 [2019]). Cockfield and Rivera testified to defendant's plan to kill the victim, and a friend of Rivera confirmed the plan, specifically how defendant[*4], Cockfield and Rivera would "shoot [the victim] up." Further, defendant confessed to committing the crime to both his girlfriend and an incarcerated individual. Turning to defendant's weight of the evidence claims, a different verdict would not have been unreasonable given that many witnesses either testified against defendant pursuant to plea agreements or had substantial criminal records and the gun was never recovered. Nevertheless, as the testimony was not inherently unbelievable or incredible as a matter of law and was fully explored during cross-examination, we accord due deference to the jury's credibility determinations and find that the verdict is supported by the weight of the evidence (see People v Delbrey, 179 AD3d 1292, 1294-1295 [2020], lv denied 35 NY3d 969 [2020]; People v Nunes, 168 AD3d 1187, 1189-1190 [2019], lv denied 33 NY3d 979 [2019]).
Defendant next asserts that he was prejudiced and deprived of his right to a fair trial by the introduction of data from his cell phone. At the time of defendant's trial, CPL former 240.20 (1) (f) provided that the People have an ongoing obligation to, upon defendant's demand, disclose "[a]ny other property obtained from the defendant, or a co[]defendant to be tried jointly."[FN3] Additionally, CPL former 240.40 (1) (c) permits a trial court to order discovery "with respect to any other property . . . [that] the [P]eople intend to introduce at trial," so long as such discovery is "material to the preparation of [defendant's] defense" and "the request is reasonable." Where the People fail to timely comply with discovery demands, "the trial court has discretion to impose a broad range of sanctions, including preclusion" (People v O'Brien, 140 AD3d 1325, 1327 [2016]; see CPL 240.70 [1]; People v Jenkins, 98 NY2d 280, 284 [2002]).
Following jury selection on the first day of trial, the People indicated that they were attempting to download data from defendant's cell phone but had so far been unsuccessful in decoding the phone's password. Defendant noted that this information had previously been requested via discovery demands. On the second day of trial, the People advised County Court and defendant that they obtained information from defendant's cell phone and intended to introduce a screenshot, text messages and two Google searches. Defendant moved to preclude this information arguing that the State Police had the cell phone for nine months, defense counsel had prepared a theme, theory and cross-examination on the evidence that he had at the time, and defendant would be prejudiced. Defendant further argued preclusion was the only viable cure.
We do not find that the People violated any discovery statute, as the People promptly turned over the cell phone evidence to defendant as soon as it was received. Moreover, the People provided a plausible explanation for the late submission due to the arduous, slow and complex process of discovering the correct password and downloading data from [*5]defendant's cell phone. Here, County Court attempted to cure any potential prejudice to defendant by only permitting the admission of a limited amount of evidence stemming from the data — as opposed to hundreds of pages of text messages and telephone calls generated from the forensic search — and offered a one-day continuance for defendant to review the newly disclosed evidence to prepare an appropriate defense. Accordingly, County Court did not abuse its discretion in denying defendant's request to preclude the evidence (see People v Jenkins, 98 NY2d at 284; People v O'Brien, 140 AD3d at 1328). To the extent that defendant argues that the People's disclosure on the eve of trial impacted his ability to secure a favorable plea bargain, we find this contention similarly unavailing. The record reflects that the People initially advised defendant that his cell phone was subject to a forensic search by the State Police, the data did not provide evidence of defendant's innocence, defendant was aware of the contents of the data on his cell phone and the People disclosed the data immediately upon receiving it. As such, defendant was aware of the requisite discoverable information at the time of plea negotiations and prior to trial (see CPL 245.25 [2]; People v Pizarro, 185 AD3d 1092, 1093 [2020]). Finally, defendant, who only sought preclusion, now asserts that his constitutional due process rights were violated. However, this claim is unpreserved as defendant raises it for the first time on appeal (see People v Kernahan, 117 AD3d 619, 620 [2014], lv denied 23 NY3d 1064 [2014]).
Defendant lastly contends that his sentence is harsh and excessive as County Court failed to consider his lack of prior violent criminal convictions in imposing the maximum sentence and, therefore, it was based solely in retribution. "It is well settled that a sentence that falls within the permissible statutory ranges will not be disturbed unless it can be shown that the sentencing court abused its discretion or that extraordinary circumstances exist warranting a modification in the interest of justice" (People v Barzee, 190 AD3d 1016, 1021 [2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1094 [2021]; see People v Marshall, 162 AD3d 1110, 1115 [2018], lv denied 31 NY3d 1150 [2018]). "In fashioning an appropriate sentence, the trial court is required to weigh and consider societal protection, rehabilitation and deterrence, as well as the circumstances that gave rise to the conviction" (People v Johnson, 197 AD3d 61, 72 [2021] [internal quotation marks and citation omitted]; see People v Pigford, 148 AD3d 1299, 1302 [2017], lv denied 29 NY3d 1085 [2017]). Here, County Court expressly considered defendant's lengthy criminal history, the nature of the crime committed, the overwhelming evidence at trial and the retributive and deterrence goals of the sentence. Accordingly, we perceive no abuse of discretion or extraordinary circumstances warranting [*6]a reduction of the sentence in the interest of justice (see People v Copp, 194 AD3d 1194, 1195 [2021]; People v Gilmore, 177 AD3d 1029, 1029-1030 [2019], lvs denied 35 NY3d 970 [2020]).
Garry, P.J., Egan Jr., Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Cockfield was also charged with criminal facilitation in the second degree.

Footnote 2: County Court did not specify if the sentences were to run consecutively or concurrently. Pursuant to Penal Law § 70.25 (1) (a), if the court does not specify the manner in which the sentences imposed are to run, the sentences shall run concurrently.

Footnote 3: In April 2019, New York passed sweeping criminal justice reform legislation that included discovery reform (see L 2019, ch 59, pt LLL, § 2, eff. Jan. 1, 2020). However, the now-abrogated CPL article 240 remained in effect for cases commenced prior to the effective date of the new legislation (see L 2019, ch 59, pt LLL, § 2, eff. Jan. 1, 2020).