Matter of Shahiem L. (2024 NY Slip Op 51389(U))

[*1]

Matter of Shahiem L.

2024 NY Slip Op 51389(U)

Decided on May 22, 2024

Family Court, Kings County

Deane, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 22, 2024
Family Court, Kings County

In the Matter of Shahiem L. 
 A Person Alleged to be a Juvenile Delinquent, Respondent.

Docket No. D-XXXXX-23

Tara Tzitzon, Esq. 
Assistant Corporation Counsel
New York City Law Department
350 Jay Street, 8th Floor
Brooklyn, NY 11201 
Cassidy Lane, Esq. 
Attorney for Child
Brooklyn Defender Services
117 Livingston Street, 7th Floor
Brooklyn, NY 11201

Jacqueline B. Deane, J.

Procedural History
The Respondent, Shahiem L., now age 16, is before the Court on a delinquency petition filed on December 8, 2023, charging Criminal Possession of a Weapon in the Second Degree and related offenses. On the Respondent's motion, he was granted a suppression hearing in [*2]accordance with Mapp v Ohio, 367 US 643 (1961). The Presentment Agency requested that the Court conduct an initial hearing pursuant to People v. Darden, 34 NY2d 177 (1974) to ascertain the existence and veracity of the confidential informant ("C.I.") who provided information to NYPD Detective Martinez that led to the apprehension of the Respondent and the recovery of a firearm from him. As further described in the Summary Report, dated March 18, 2024, the Court conducted the hearing in a sealed courtroom, outside the presence of the Respondent and his counsel, and included testimony by both Detective Martinez and the C.I. The Court found that the existence, reliability, and overall credibility of the C.I. were established. The minutes of the Darden hearing have been obtained and are held by the Court under seal for purposes of review on appeal. The Court then held the remainder of the suppression hearing in an open courtroom with all present on April 5th, May 1st, and May 2nd, 2024.
Defense counsel moved to strike Officer Quizhpy's testimony on May 1st, after having begun cross-examination, based on the fact that the Officer referred to a prior car stop he had made involving the Respondent three or four months before as his basis for him recognizing the Respondent's full name and what he looked like. This fact was not mentioned in the discovery the Respondent received prior to the start of the hearing which also did not include any of the reports or videos related to the prior encounter. Each of these documents clearly constituted discovery, Rosario, and/or possibly Brady material that should have been turned over at the start of the defense cross-examination, at the very latest. See FCA § 331.2 and 331.4; see also CPL § 245.20. The Court ordered the Presentment Agency to provide any and all reports it could obtain before the next day's adjourn date. Prior to the scheduled hearing time on May 2nd, the Presentment Agency provided several reports but did not yet have a copy of the recorded radio run. Although the Presentment Agency did not have the official body camera footage, they were able to access it from the officer's phone, and therefore, the hearing was delayed to allow the defense to view the footage before continuing cross examination. The Court reserved decision as to whether to grant any sanction pursuant to FCA § 331.6 for this discovery violation.

Evidence
As noted in the Court's summary of the Darden hearing, the C.I. provided the assigned "Field Intelligence Officer" Detective Martinez with information that the C.I had observed a person in possession of a firearm in a specific location and provided a description of that person. Specifically, the C.I. testified that the person the C.I. knew of as "Sha" was wearing a black coat and hoody, black jeans and black and blue sneakers. When asked by the Court whether the C.I. could describe "Sha" further, the C.I. testified that "Sha" had brown skin and braids and was around 16 years old; the C.I did not state whether the C.I. gave those additional details to the Detective. The C.I. had never spoken to "Sha" before but had heard "everyone" in the area call him by that nickname. At the Darden hearing, Detective Martinez testified that he was given the clothing description along with the physical details that "Sha" had brown skin and braids and was around 5'6' and 16 years old. Detective Martinez believed "Sha" to be "Shahiem L." "based on a prior investigation" because the C.I. said "Sha from Albany was in front of 1144 Bergen Street and gave me the description" which the Detective testified matched what he knew Shahiem to look like. The Detective further testified that 1144 Bergen Street was a "known hang out area" as it was two blocks from the Albany apartment complex. Detective Martinez, who is a member of the NYPD's citywide Criminal Intelligence Division, testified that he relayed all this information, the tip and the full name he attached to it, to officers of the 77th Precinct who were in the field. Detective Martinez later observed the Respondent, who matched the description [*3]given by the C.I., at the precinct after Shahiem's arrest.
The Presentment Agency did not call Detective Martinez at the open portion of the Mapp hearing to elaborate on his basis of knowledge of Shahiem L. and allow for his cross-examination, despite the fact that the Detective's identity was not concealed or confidential. The Presentment Agency's sole witness at this hearing was Police Officer Quizhpy of the 77th precinct.
Officer Quizhpy testified that, at approximately 6:20pm on October 24, 2023, he and his field safety team were given information about a tip from Officer Mancia, who came into the room at the precinct where the team was sitting and reported it to them directly. The tip, as told to Officer Quizhpy, was of an individual, recently seen by a C.I., "wearing a black jacket, black pants, black shoes, and goes by the name "Sha" also known as Shahiem L.," who was outside 1144 Bergen Street and had a gun, along with another tip from the C.I. about a second individual with a gun at the same location wearing a red jacket and black pants who went by the name "Mickey Ikey." Transcript, April 5, 2024, p. 20-21. Officer Mancia told the team that he had been given these descriptions by Detective Martinez who was their "field intelligence officer," and the Detective had received it from the paid informant. Officer Quizhpy testified that he knew the name Shahiem L. because he "had a prior interaction approximately three, four months ago during a traffic stop" and that he was aware of what he looked like physically. Id. at p. 22. On cross-examination, Officer Quizhpy said "I had prior interaction with the individual. So once he told me the name, I knew who it was." Transcript, May 1, 2024, p. 25.
Officer Quizhpy and his team responded to the scene of 1144 Bergen Street, within minutes of being given the tip, at approximately 6:35pm. It was dark out with some lights, and there was a large group of individuals on the sidewalk as there was a vigil for someone who had died. Officer Quizhpy testified on direct examination that he observed Shahiem standing up against a gate outside the building and that Shahiem "was wearing the same outfit that was given to us in the description. We both made eye contact. As we approached the individual, he proceeds to run." Transcript, April 5, 2014, p. 23. Officer Quizhpy later elaborates: "I made eye contact with him the moment I'm going to stop him. Proceeds to run. We both get into a tussle. We fall to the ground. Things become combative due to the fact there is multiple people at the location " Id. at p. 27. According to Officer Quizhpy, as he approached, Shahiem "kept putting his head down and he pretty much was trying to cover himself from being seen by us." Id. at p. 29. After defense counsel objected to this conclusory statement, the Officer acknowledged that what he had actually observed was that Shahiem was leaning against the gate with his head bent down/forward. When the Officer approached, he "proceeded to stop [Shahiem]" and "at that moment I stopped him [Shahiem] proceeded to run." The Officer further clarified that he "tried to grab [Shahiem]" and did in fact "grabbed him from the waist" and was "facing him front to front." Id. at 30. After Shahiem was brought to the ground, he was handcuffed, and a gun was recovered from Shahiem by Officer Mancia, as observed by Officer Quizhpy. The Presentment Agency also introduced into evidence, without objection, photographs taken of the Respondent, his black clothing and the gun, after his arrest. See PA Exhibits 1-6.
On cross-examination, defense counsel moved Officer Quizhpy's body worn camera into evidence, without any objection by the prosecution, and used it to have the officer narrate his movements in his testimony. See Defense Exhibit A. Officer Quizhpy identified himself stepping onto the sidewalk outside 1144 Bergen, where there were a number of people, and he put two hands on an individual wearing a red jacket. Officer Quizhpy then continues walking [*4]and shines his flashlight on an individual in a green North Face jacket, and another officer is holding that man by the arm as Officer Quizhpy interacts with that officer. This point in the video is at one minute and twenty-five seconds. Officer Quizhpy then shines his flashlight on Shahiem, who is nearby, and Officer Quizhpy acknowledges that from the video, one can see Shahiem holding his cellphone in two hands and he is looking down at it. This point in the video is at one minute and twenty-six seconds. At one minute and twenty-eight seconds, the video goes black, and one cannot see exactly what is happening. The defense then places Officer Mancia's body worn camera into evidence without any objection by the prosecution. See Defense Exhibit B. Since Officer Mancia is slightly behind Officer Quizhpy, one can see in his video that there is a mere one to two seconds between the time Shahiem is seen standing and when Shahiem is taken to the ground by four or more officers at the one minute and twenty-five second mark in Exhibit B. Officer Quizhpy acknowledges that it "was less than a second" from the time he shined the flashlight on Shahiem and when he "grabbed him." Transcript, May 1, 2024, p. 11. Officer Quizhpy later agreed that the flashlight was only on Shahiem for "maybe one second" before Shahiem "took a step away" and "he doesn't get more than a couple of steps before [they're] both on the ground." Id. at p. 33. Finally, Officer Quizhpy admitted not seeing a gun, a bulge, or any outline of a gun before Shahiem was taken to the ground and searched and that both Shahiem's hands were visible holding his phone.
Officer Quizhpy did not know whether the full legal name, Shahiem L., came from the C.I. or one of the intermediary officers who passed on the information, Detective Martinez or Officer Mancini. At the defense's request, the Presentment Agency agreed to stipulate that the C.I.'s tip did NOT include the full legal name of the Respondent, only an alleged "street name" of "Sha." The officer also acknowledged that he did not know if the tip gave the age or hairstyle of the individual named "Sha."
In relation to the traffic stop that included Shahiem from three or four months ago, Officer Quizhpy could not remember any details of that event except that it happened at night, took maybe 10 minutes, there were several people in the car, and he was not the arresting officer. Officer Quizhpy did not remember the type of car, where Shahiem was sitting, whether he searched the car or Shahiem, or any of the other occupants. The officer believed Shahiem was brought back to the precinct, but not arrested, and was released to a parent. Officer Quizhpy did not fill out any reports for that car stop; a different officer wrote summonses for another occupant. There was no paperwork completed on the night of the car stop that had the Respondent's full name on it. The defense noted through cross-examination that Officer Quizhpy did ask Shahiem when processing his arrest on the evening of October 24, 2023, whether he had ever been arrested before.

Decision
First, as to the discovery violation, the Court is denying the request to strike the officer's testimony but is issuing a sanction of an adverse inference. In People v Ranghelle, the Court of Appeals held that when there is a delay in producing Rosario material, the court "must ascertain when the defense was substantially prejudiced by the delay." 69 NY2d 56, 63 (1986). When there is a complete failure to produce the material, the court is not to "attempt to determine whether any prejudice accrued," but rather the failure is per se error. Id. Nonetheless, the Court is to avoid imposing a more severe sanction than is needed to eliminate the potential prejudice to the accused. See People v Jenkins, 98 NY2d 280, 284 (2002).
Here, after the Respondent began cross-examination but before it was concluded, he was [*5]provided with the memo book and activity log from the event in question, neither of which mention the Respondent, as well as summonses that were given to others involved in the stop. Defense counsel was also given an opportunity to review the officer's body worn camera footage before continuing her cross-examination, at her request, the same day. The Family Court Act requires that this Rosario material, specifically, be turned over, at the latest, prior to the start of cross-examination at a pre-trial hearing, and for other discovery, earlier pursuant to a demand to produce. See FCA § 331.4(3) and 331.2. As defense counsel notes, the discovery provisions in adult court proceedings were changed in 2020 to require that these materials be provided much sooner. See CPL § 245.20. While this new law has not yet been found to be fully applicable to Family Court as of yet, this Court believes that fundamental fairness and equal protection require consideration of the value to a juvenile respondent of his defense counsel having enough advance notice of any relevant evidence to be fully prepared. Thus, under both statutes, these items were clearly delayed.
The Presentment Agency was not able to obtain the radio run recording at all on the day of the hearing, and the Respondent did not want any further continuance, as offered by the Court, to see if the recording could be obtained. While the body camera footage presumably offered a complete viewing of the stop of the car the Respondent was in and what ensued after, the recording of any radio run may have offered further detail as to the basis of the stop and Shahiem's role if any. This failure can be viewed similarly to a delay scenario, given the adjournment offered by the Court. However, either way, the facts establish that some prejudice was caused to the Respondent by these violations. Given that the material that was turned over with sufficient time for the defense to make effective use of it in cross-examination, the Court finds that an adverse inference is sufficient to remedy the prejudice suffered. See People v Signor, 173 AD3d 1264, 1266 (3d Dept. 2019) (adverse inference sanction was not abuse of discretion for the destruction of police video); People v Hill, 265 AD2d 426 (2d Dept. 1999) (the court's adverse inference charge was an appropriate remedy for the failure to timely comply with discovery). Specifically, the Court will infer that the radio run would not have included any information specific to the Respondent which would have enhanced Officer Quizhpy's memory of his being in the car that night.
Turning to the issue of suppression, the Presentment Agency has the initial burden at a Mapp hearing of showing, by credible evidence, the lawfulness of the police conduct (People v Ramirez-Portoreal, 88 NY2d 99 [1996]; People v Berrios, 28 NY2d 361, 367 [1971]; People v Hernandez, 40 AD3d 777, 778 [2d Dept. 2007]). In evaluating the police action, the Court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances present at the time (People v DeBour, 40 NY2d 210, 215 [1976]). If the Presentment Agency satisfies this initial burden, the Respondent "bears the ultimate burden of proving that the evidence should not be used against him" (Berrios, 28, NY2d at 367).
According to the testimony at the Darden hearing, the C.I. provided Detective Martinez with a description of an individual around 16 years old with brown skin and braids, wearing a black coat and hoody, black jeans and black and blue sneakers who goes by the name "Sha" and who was at the location of 1144 Bergen Street where the C.I. allegedly observed him in possession of a firearm. This description was then provided, either in whole or part, by Detective Martinez to Officer Mancia with the addition of the full legal name of this Respondent, Shahiem L. Officer Mancia then passed on that information, in whole or part, to Officer Quizhpy and his team, leading to Officer Quizhpy's seizure and arrest of the Respondent. According to Officer [*6]Quizhpy's testimony, the description he ultimately received was of an individual with a gun wearing a black jacket, black pants, and black shoes who goes by the name "Sha," but has the full name Shahiem L., who was at the location of 1144 Bergen Street. There were some details from the original description alleged to have been given by the C.I. at the Darden hearing that were NOT testified to by Officer Quizhpy, specifically that the individual was 16 years old, with brown skin, and wearing a black hoody, and that the sneakers had blue as well as black. It is unclear whether these details were omitted by the C.I., Detective Martinez or Officer Mancia in the information chain. However, there is no question that the alleged full legal name of this person was added by Detective Martinez, presumably based on the description given by the C.I. coupled with his belief from "a prior interaction." Officer Quizhpy was then given Shahiem's full legal name but only a very general, vague clothing description of black jacket, black pants, and black shoes — no physical characteristics.
Thus, in this case, the information that led to the Respondent's arrest was provided initially by a C.I. and then passed on to THREE different police officers, with some details changed along the way, before the Respondent was actually seized. The Aguilar-Spinelli test, enunciated by the U.S. Supreme Court in warrant cases, has been applied by New York courts to determine "whether hearsay information possessed by the police is sufficient to establish probable cause for a warrantless arrest." People v. Parris, 83 NY2d 342, 346 (1994), citing Jones v. United States, 362 US 257, 270. Therefore, the Court must analyze both the reliability of the information provided at each stage and whether the basis of knowledge for the information that was ultimately given to Officer Quizhpy was sufficient to justify his actions.
Pursuant to People v. Darden, 34 NY2d 177 (1974), a Court must ascertain the existence and veracity of a confidential informant ("C.I.") whose information leads, in whole or part, to the police apprehension of a suspect. The purpose of a Darden hearing is "insuring that the confidential informant both exists and gave the police information sufficient to establish probable cause, while protecting the informant's identity." People v. Edwards, 95 NY2d 486 (2000).
With regard to the C.I., the informant's reliability and basis of knowledge was adequately established at the Darden hearing. As noted in the Summary Report, the credible testimony demonstrated that the C.I. has worked with Detective Martinez since 2019 and before that has been a C.I. since 2010. The C.I. has provided information to Detective Martinez in over 100 cases that has led to the recovery of firearms in a majority of those, as well as court approval of over 50 search warrants. In this particular matter, the C.I. was able to give a physical description of the Respondent as well as of his clothing and the location where the C.I. observed the Respondent in possession of a firearm.
The next link in the chain is Detective Martinez, who must be analyzed separately as he added to the information given by the C.I. by concluding that the person described as "Sha" was, in fact, Shahiem L. As testified by the detective at the Darden hearing, Detective Martinez based this conclusion on "a prior investigation" and the fact that he knew Shahiem to live two blocks from the location provided by the C.I. and that the Bergen Street address was a "known hang out area."
Pursuant to the "fellow-officer rule," an officer may take action to arrest or stop a suspect "without personal knowledge sufficient to establish probable cause, so long as the officer is acting 'upon the direction of or as a result of communication with' a fellow officer or another policy agency" with information sufficient to constitute probable cause. See People v. Ketcham, [*7]93 NY2d 416, 419 (1999); quoting People v. Horowitz, 21 NY2d 55, 60 (1967). Although the knowledge of the "sending officer" is initially imputed to the "receiver," once the police conduct is challenged through a motion to suppress, the "challenged police conduct can be sustained only by proof that the sender actually possessed the requisite knowledge or that the personal observation of the receiving officer justified the search." People v. Havelka, 45 NY2d 636, 641 (1978); People v Christian, 118 AD2d 793, 794 (2d Dept 1986).
The Court does not believe that the Detective's vague statement of knowledge from "a prior investigation" coupled with the fact that Shahiem lives in the Albany houses two blocks away is a sufficient basis for his conclusion that the individual described by the C.I. was Shahiem, especially since the C.I. testified this was a vigil of approximately 200 people. Detective Martinez did not elaborate on this basis further, which, in any event, would not have been appropriate given the limited scope, purpose, and ex parte nature of the Darden hearing. However, it was the obligation of the Presentment Agency to fill in this critical gap by calling Detective Martinez at the Mapp hearing, where he could have been cross-examined, or by providing the details for his alleged basis of knowledge through another officer. See People v. Parris, 83 NY2d at 346 ("the People are not obligated to produce any particular witness provided they sustain their burden of coming forward with evidence showing there was probable cause for the arrest" which can be done through hearsay). Without this information, the Court has no ability to assess the validity of Detective Martinez's identification of Shahiem L. as the person described by the C.I. See People v. Petralia, 62 NY2d 47, 51-2 (1984) ("the key factor in [Lypka and Havelka] is that the record did not indicate how the sending officer had acquired his information").
This piece of information is critical because, without it, the clothing description given of the individual by Officer Mancini to Officer Quizhpy was too vague and general to justify a stop or arrest on its own. See People v. White, 117 AD2d 127, 130 (2d Dept. 1986) (the description lacked the requisite specificity and detail to provide probable cause for an arrest"). Although the C.I. had given some physical description of the person to Detective Martinez, those details were not passed on to Officer Quizhpy who was left with simply a person in a black jacket, pants and sneakers with no distinctive identifying markings or brand names. This was not a situation where there were one or two people standing at the location provided by the C.I. Contrast People v Knight, 94 AD3d 1527 (4th Dept 2012) (defendant was the sole individual standing at the location who matched the specific description minutes after it was given by the C.I.). Rather, this was a vigil for someone who had died and there was a large community gathering. There are double parked cars visible in the body camera footage all up and down the block, and the sidewalk is lined with people when the officers approach in the dark. With the benefit of this footage, the Court is able to see several individuals wearing all black that the officer walks past on his way to Shahiem. Therefore, Shahiem was not the only person at that location who fit the general clothing description such that additional information would have been needed before he could be stopped and searched.
Even if the Court were to accept as reliable the attachment of Shahiem's full legal name to the identity of the person with the gun, the Court finds Officer Quizhpy's testimony unconvincing as to his memory of, not only the full name of Shahiem L. as one person in the car that he pulled over at night three or four months ago, but more importantly, exactly what Shahiem looked like such that he could recognize him in the dark after only a few seconds of observation. It bears noting that Shahiem had his hood up at the time he was stopped, so only his [*8]face was visible. The ability of Officer Quizhpy to identify Shahiem essentially instantaneously under these conditions is inconsistent with the lack of memory that Officer Quizhpy had as to the circumstances of, or any details whatsoever, regarding the car stop generally. Officer Quizhpy did not even remember why the car was stopped, nor could he name or describe any of the other occupants of the car besides Shahiem, even the person to whom summonses were given. This is all strong evidence that there were no notable circumstances of this stop that would cement the names or appearances of any of the occupants of the car in his memory, including Shahiem. The fact that Officer Quizhpy did not complete any paperwork himself, nor was there any paperwork located that contained Shahiem's name, further undercuts the strength of Officer Quizhpy's memory and ability to recognize Shahiem by his full legal name and face four months later. It is also notable that Officer Quizhpy asked Shahiem during his arrest processing if he had ever been arrested before and neither his activity log nor any of the paperwork completed after Shahiem's arrest make note of the Officer's prior knowledge of Shahiem.
As the Court is not convinced that Officer Quizhpy had an adequate basis to recognize this individual as Shahiem L., he did not have either reasonable suspicion to stop him, which he would have needed at the point he grabbed his waist, or probable cause for the full seizure that occurred when Shahiem was taken to the ground. Rather, Officer Quizhpy had only a common law right to inquire and would have needed to ask Shahiem some questions to confirm his full name or even the nickname "Sha," or have seen some other indicia of criminality given the generality of the description. Officer Quizhpy was clear that he did not see any bulge or outline of a gun and that Shahiem's hands were visible as he was simply engaging in the typical teenage behavior of looking at his phone.
The Court does not believe that Shahiem's movement of turning away and taking a step or two was enough to constitute flight or a furtive gesture to raise the level of suspicion here. It is notable that in his testimony, Officer Quizhpy tried to interpret the normal behavior of Shahiem looking down as suspicious, stating that Shahiem "kept putting his head down and he pretty much was trying to cover himself from being seen by us." Transcript, April 5, 2024, p. 29. When confronted with his own body camera video, Officer Quizhpy had to acknowledge that Shahiem was simply looking down at his phone and that Shahiem's face was visible.
The videos show the officers approaching and physically interacting with a male in a partially green jacket who was standing very near Shahiem. Shahiem was just leaning with his back against a gate looking at his phone during that encounter and only started to move when the officer shined a light in his face. This would startle any person who might then naturally turn away from the glare, not for any reason indicative of criminality. It is apparent from the video that Shahiem only has time to turn and take a step or two away before he was brought to the ground by multiple officers. In fact, Officer Quizhpy acknowledges on cross-examination that he "arrested Shahiem a couple of seconds after [he] shined [his] flashlight on him." Transcript, dated May 2, 2024, p. 33. "Such behavior was too ambiguous and equivocal to reasonably elevate the officer's suspicions." People v. White, 117 AD2d at 132 (2d Dept. 1986); see also People v. Williams, 201 AD2d 381 (2d Dept. 1994). This action constituted a full seizure of Shahiem which, for the reasons stated above, was conducted without probable cause to believe Shahiem in fact had a firearm.
For all of these reasons, including the adverse inference which the Court is taking due to the various discovery violations, this Court does not find that the Presentment Agency met its burden of going forward to establish the legality of the police actions here. Id. Therefore, the [*9]firearm is suppressed and cannot be admitted at the fact-finding hearing.
Date: May 22, 2024
ENTER:
Hon. Jacqueline B. Deane, JFC